## COLORADO-WYOMING GAS CO. v. FEDERAL POWER COMMISSION ET AL.

No. 575.   Argued January 30, 1945.—Decided April 2, 1945.

*Mr. Donald C. McCreery,* with whom *Messrs. Paul W. Lee, George H. Shaw* and *Wm. A. Bryans, III* were on the brief, for petitioner.

*Mr. Charles V. Shannon,* with whom Solicitor General *Fahy,* Assistant Attorney General *Shea, Messrs. Chester T. Lane, Paul A. Sweeney, Harry S. Littman, Stanley M. Morley* and *Louis J. O'Marr,* Attorney General of Wyoming, for the Federal Power Commission et al., respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case is a companion case to *Colorado Interstate Gas Co.* v. *Federal Power Commission* and *Canadian River*

*Gas Co.* v. *Federal Power Commission, ante,* p. 581. Petitioner began operations in 1925. Until 1929 petitioner obtained its entire supply from the Wellington Field of the Continental Oil Co., near Ft. Collins, Colorado. Its transmission line ran from that point north to Cheyenne, Wyoming. The Wellington Field began to diminish. So petitioner, in October, 1929, entered into a twenty-year contract with Colorado Interstate to purchase gas from it, the gas to be delivered to petitioner at its metering station near Littleton, Colorado. Accordingly, in 1929 and 1930 petitioner constructed a pipeline between Ft. Collins, Colorado, and Littleton, Colorado, where connection was made with Colorado Interstate's transmission system. Between 1929 and 1939 branch lines were constructed to serve various cities, towns, and industrial customers in Colorado. At the present time all but two per cent of its gas is obtained from Colorado Interstate. Petitioner sells gas at the Cheyenne city gate to its affiliate Cheyenne Light, Fuel and Power Co. It also sells directly to industrial consumers in Colorado and to some extent in Wyoming. And it sells gas at various city gates in Colorado for resale.

The investigation and hearings on the interstate wholesale rates of Canadian, Colorado Interstate and petitioner were consolidated. As we have seen, the Commission ordered Canadian to reduce its rates by $561,000 per year. That amount made up part of the $2,065,000 annual reduction which the Commission ordered in the rates of Colorado Interstate. In the present case the Commission found that petitioner's revenues were $159,000 in excess of costs and a fair return and that $119,000 of that excess were allocable to petitioner's sales for resale. The Commission ordered petitioner to reduce its wholesale rates by $119,000 a year (43 P. U. R. (N. S.) 205, 234). That does not represent the net decrease in revenue, since the Commission ordered Colorado Interstate to reduce its

rates to petitioner by $98,000 a year. Accordingly, the net decrease in revenues of petitioner will be $21,000 if the Commission's order stands. The petition for certiorari which we granted to review the judgment of the Circuit Court of Appeals affirming the order of the Commission (142 F. 2d 943) was limited to the question whether the allocation of cost of service used by the Commission is without support in the record and contrary to law.

The Commission in this case as in *Colorado Interstate Gas Co.* v. *Federal Power Commission* and *Canadian River Gas Co.* v. *Federal Power Commission* did not make a separation of properties used in the regulated business from those used in the unregulated. It used instead the same method of allocation of costs as it did in those other cases. Petitioner contends that the Commission's method of allocation of costs included in the regulated business a part of its business which Congress has not subjected to regulation by the Commission. As we have noted, petitioner's transmission line commences in Colorado near Littleton where it connects with the pipeline of Colorado Interstate. Petitioner sells some of its gas in Colorado for resale to domestic users in certain towns in Colorado. The Commission held that those wholesale sales were subject to its jurisdiction. Petitioner contends that those sales are made in intrastate commerce and are not subject to the Commission's rate-making powers. Its position is that the one and only sale for resale by it in interstate commerce is the sale at the city gate in Cheyenne, since none of the Colorado sales involve interstate commerce so far as petitioner is concerned.

The answer turns on the meaning of § 1 (b) of the Act (52 Stat. 821, 15 U. S. C. § 717) which provides:

"(b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial,

industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

The Commission relied on *Illinois Gas Co.* v. *Central Illinois Co.*, 314 U. S. 498, in concluding that it had jurisdiction over the wholesale sales in Colorado. That case presented the question whether the Illinois Commission or the Federal Power Commission had authority to authorize a pipeline extension wholly within Illinois. The company proposing the extension (Illinois Gas Co.) owned a pipeline system wholly in Illinois which was connected at various points in that State with the pipeline of its parent company, Panhandle Eastern Pipe Line Co., which owned and operated a natural gas pipeline system from gas fields in Texas, Kansas and Oklahoma across Illinois and into Indiana. The Illinois company purchased its gas under a long term contract from Panhandle Eastern and transported it through its own lines to local gas distributing utilities in Illinois to which it sold the gas for distribution to consumers in various Illinois cities. We held that the Illinois company by virtue of § 7 (c) of the Act [1] could

---

[1] Sec. 7 (c) provides in part:

"No natural-gas company shall undertake the construction or extension of any facilities for the transportation of natural gas to a market in which natural gas is already being served by another natural-gas company, or acquire or operate any such facilities or extensions thereof, or engage in transportation by means of any new or additional facilities, or sell natural gas in any such market, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require such new construction or operation of any such facilities or extensions thereof: . . ."

A natural-gas company is defined in § 2 (6) as a "person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

build an extension to connect with the facilities of a company distributing gas to consumers in Illinois only after obtaining a certificate of public convenience and necessity from the Federal Power Commission. We held that the Illinois company and Panhandle Eastern were engaged "in interstate commerce in the purchase and sale of the natural gas which moves in a continuous stream from points without the state" into the pipes of the Illinois company; and that "the particular point at which the title and custody of the gas pass to the purchaser, without arresting its movement to the intended destination, does not affect the essential interstate nature of the business." 314 U. S. pp. 503, 504. We pointed out that the purpose of the Act was to provide "an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate, which this Court had declared to be interstate commerce not subject to certain types of state regulation." *Id.*, p. 506. We reviewed the earlier decisions of the Court which adopted the mechanical test for determining when interstate commerce ends and intrastate commerce begins, viz., when the gas is introduced into the service pipes of the local distributor. We noted that it was to fit the pattern of state regulation reflected in those decisions that the Natural Gas Act was passed.

Accordingly, we conclude that if petitioner's pipeline were to be constructed today from Littleton, Colorado to the city gates of the Colorado towns where petitioner's gas is resold, § 7 (c) would require that a certificate of public convenience and necessity be obtained from the Commission. For in this case as in *Illinois Gas Co.* v. *Central Illinois Co., supra,* the gas which petitioner purchases from Colorado Interstate moves in a continuous stream across state lines to local distributing companies in Colorado as well as Wyoming. If petitioner is engaged in "the transportation of natural gas in interstate com-

merce" to those Colorado towns within the meaning of § 1 (b), its wholesale sales in Colorado are also sales "in interstate commerce of natural gas for resale for ultimate public consumption" as those words are used in § 1 (b). That commerce does not end until the gas enters the service pipes of the distributing companies.

Most of the other objections which petitioner raises to the Commission's method of allocation of costs have been considered in the cases of *Colorado Interstate Gas Co.* v. *Federal Power Commission* and *Canadian River Gas Co.* v. *Federal Power Commission.* We need not repeat what we said there. But there are a few distinct phases of this case which must be separately stated.

Petitioner says that the Commission treated it along with Canadian and Colorado Interstate as an integrated unit for purposes of the allocation of costs. The inference is that the Commission combined petitioner's costs with those of the other two companies and allocated the combined costs three ways. That is not the fact. Petitioner is independent in management and control from the other two. Its system was not constructed as part of Canadian's and Colorado Interstate's system but was started independently and connected with the others at a later stage. The Commission recognized that in operation the three-company project was a single one in the sense that an alteration in Canadian's rates affected the reasonableness of the rates of Colorado Interstate and in turn the reasonableness of the rates of petitioner. But when it came to an allocation of costs among petitioner's classes of business the Commission considered petitioner's costs alone.

Here as in the cases of Canadian and Colorado Interstate the findings of the Commission leave much to be desired. The findings are general and incorporate by reference the staff exhibits, on which reliance is put for the subsidiary findings. But in this case there are added dif-

ficulties. The staff used one system, the Commission another. As the Commission said, the staff "departed from the use of the system peak day for allocating demand (fixed) costs and combined the separate class peaks of resale customers and of main line industrial customers." 43 P. U. R. (N. S.) p. 233. The Commission thought a different method would be in keeping with petitioner's operations. It said: "The Colorado Portland Cement Company, the principal main line industrial user, is curtailed regularly during system peak days. Its demand on the system peak day is, in our opinion, a proper measure of its proportionate share of demand costs than its highest off-peak demand. Accordingly, the principles and methods of cost allocation presented by Commission staff are adopted with the modification that the coincident demands of all customers on the system peak day are used, and with exception of deliveries to Highway Gas Company." 43 P. U. R. (N. S.) p. 234. When we read that finding against the record there are ambiguities which we are unable to resolve were it our province to do so.

(1) The "system peak day" is February 9, 1939—the same day chosen for Canadian and Colorado Interstate. We know from our search of the record that is not the actual peak day in 1939 for petitioner's business. We are told by the Commission in its brief that it is the ratio of deliveries to the regulable and non-regulable customers rather than total deliveries that determines the allocation of capacity costs. But there are no findings which indicate why the system peak day for other companies should be taken as the system peak day for this company. Nor are there any findings which indicate that the ratio on the system peak day is a more reliable guide in the allocation of costs than the ratio on the actual peak day of this company.

(2) The Commission says it allocated capacity costs on the basis of the "coincident demands of all customers

on the system peak day." It said that Colorado Portland Cement Co. is "curtailed regularly during system peak days" and that its "demand" on that day is the proper measure of its proportionate share of capacity costs. We assume it meant by "coincident demands" on the system peak day, the amount of gas actually delivered on that day, not the customers' respective needs for gas on that day. But when we turn to the record there are ambiguities. The staff exhibit on which the Commission apparently relied designates as one classification the "maximum day deliveries on Colorado Interstate Gas Co. peak day—Thurs., Feb. 9, 1939." Under that heading we compute 1,777 Mcf to direct-sale customers and 9,009 Mcf to resale customers on February 9, 1939. The Commission in its brief tells us that that was the basis on which it allocated capacity costs, viz. 83.5 per cent to the resale gas, 16.5 per cent to the direct-sale gas. But there is evidence in the record that the direct-sale customers received on February 9, 1939 not 1,777 Mcf but only 522 Mcf. If we use 522 Mcf rather than 1,777 Mcf in our computations we shift to the interstate wholesale sales almost $21,000 additional costs. Now the net rate decrease ordered by the Commission in this case amounted to $21,000. Hence that net decrease substantially disappears if we take 522 Mcf rather than 1,777 Mcf as the amount of direct sales on Feb. 9, 1939. The choice of the lower figure would thus be fatal to the Commission's case.

We do not know why the lower figure was rejected. There are no findings to guide us. In the record there is testimony which may suffice as a partial reconciliation of the difference and which casts some doubts on the accuracy of the lower figure. But we have been unable completely to reconcile the difference. We do know from a reading of the record that the staff exhibit from which the 1,777 Mcf item was obtained was based at least in

part on averages or estimates, not on actual deliveries. It is not clear whether 1,777 Mcf rested on estimates or reflected actual deliveries by petitioner on Feb. 9, 1939. The caption "maximum day deliveries on Colorado Interstate Gas Co. peak day—Thurs., Feb. 9, 1939" is ambiguous. It may mean that the gas delivered to petitioner by Colorado Interstate on that day was apportioned among the several classes of customers according to their actual use on that day. It may mean actual deliveries by petitioner during that day. The figures may or may not be the same.

The review which Congress has provided for these rate orders is limited. Sec. 19 (b) says that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." But we must first know what the "finding" is before we can give it that conclusive weight. We have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest. *Florida* v. *United States,* 282 U. S. 194, 215; *United States* v. *Baltimore & Ohio R. Co.,* 293 U. S. 454, 464; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 504–505, 510–511; *United States* v. *Carolina Carriers Corp.,* 315 U. S. 475, 488–489. Their absence can only clog the administrative function and add to the delays in rate-making. We cannot dispense with them for Congress has provided the standards for judicial review under this Act. § 19 (b). The courts cannot perform the function which Congress assigned to them in absence of adequate findings. Nor are they authorized under § 19 (b) to make findings and substitute them for those of the Commission.

We think it is plain that $98,000 of the rate decrease ordered by the Commission in this case is valid since it reflects the reduction in the rates of Colorado Interstate from whom petitioner purchases practically all of its gas. But the balance of the $119,000 rate decrease which was

ordered, viz. $21,000, is so shrouded in doubt that further findings by the Commission are necessary.

Accordingly, we affirm the judgment below insofar as it sustained the order of the Commission directing petitioner to reduce its rates by $98,000. As to the balance of the rate reduction, we reverse the judgment below, set aside the order of the Commission, and remand the cause for further proceedings in conformity with this opinion. See § 19 (b).

*It is so ordered.*

The CHIEF JUSTICE, MR. JUSTICE ROBERTS, MR. JUSTICE REED, and MR. JUSTICE FRANKFURTER are of the opinion that the case should be remanded to the Commission for separate allocation of investment and operating cost between the regulable and nonregulable properties, as well as for the clarification of findings directed in the opinion. They agree that the deliveries to wholesalers in Colorado are in interstate commerce.