**PANHANDLE EASTERN PIPE LINE CO.**

v.

**MICHIGAN CONSOL. GAS CO.**

**Civ. No. 7518.**

United States District Court
E. D. Michigan S. D.
Dec. 23, 1953.

---

13. See Huber Baking Co. v. Stroehmann Bros. Co., 2 Cir., 1953, 208 F.2d 464.

Clifford B. Longley, Henry C. Bogle, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich. (Robert M. Morgenthau, Patterson, Belknap & Webb, John S. L. Yost, New York City, Samuel Riggs, Liberal, Kan., of counsel), for plaintiff.

Walter M. Meek, Dyer, Angell, Meek & Batten, Detroit, Mich., for defendant.

LEVIN, District Judge.

The plaintiff, Panhandle Eastern Pipe Line Company (hereinafter referred to as Panhandle), is a Delaware corporation owning and operating a natural gas pipe line system which extends from Texas through the states of Kansas, Missouri, Illinios, Indiana, Ohio and into Michigan. The defendant, Michigan

Consolidated Gas Company (hereinafter referred to as Consolidated), is a Michigan corporation with its principal office in the City of Detroit. It is a gas utility engaged in the business of distributing gas to industrial and domestic consumers in Michigan. In 1935 Panhandle and Consolidated (which was then known as Detroit City Gas Company) entered into an Agreement under the terms of which Panhandle was to sell natural gas to Consolidated for resale by Consolidated.

In 1938 the Natural Gas Act [1] was enacted regulating the transportation and sale of natural gas in interstate and foreign commerce. Since the sales of natural gas by Panhandle to Consolidated covered by the aforementioned Agreement were sales in interstate commerce, they came within the purview of the Natural Gas Act and were subject to the authority of the Federal Power Commission.

Pursuant to the regulations of the Commission, Panhandle filed this Agreement with the Commission, and it became effective as Rate Schedule No. 12. Certain amendments, adopted by consent of the parties, were also filed as supplements to Rate Schedule No. 12. In all, there were four such supplements prior to September 23, 1942. As of that date, Panhandle was obligated to deliver up to 125,000,000 cubic feet of gas per day at specified rates to supply Consolidated's general requirements. [2]

On September 23, 1942 the Commission determined that the rates charged by Panhandle were excessive and ordered Panhandle to file new schedules of rates and charges for each of its purchasers which would reflect an over-all reduction prescribed by the Commission. After protracted court and administrative proceedings, satisfactory schedules were submitted, and by an order of November 2, 1945 the Commission accepted them as supplements to the filed schedules. The new schedule affecting Consolidated was designated as Supplement No. 5 to Rate Schedule No. 12.

Two rate schedules are contained in Supplement No. 5: (a) Gd-1 which governs the rate for gas delivered to a utility for resale pursuant to a firm contractual commitment by Panhandle to supply either all of the utility's gas requirements or a fixed amount of such requirements; and (b) Rd-2 which governs the rate for gas which Panhandle is not under a firm obligation to deliver but which it does deliver when it is willing and able to do so. Gas purchased under Schedule Gd-1 is said to be purchased on a "firm" basis, and gas purchased under Schedule Rd-2 is said to be purchased on an "interruptible" basis.

Schedule Gd-1 provides a differential rate for deliveries made on a "firm" basis: a "base load" rate and a rate for purchases in excess of "base load." [3] The "base load" rate is determined by

1. 15 U.S.C.A. § 717 et seq.

2. Supplement No. 4 of Rate Schedule No. 12, dated June 29, 1940.

3. Rate Schedule Gd-1
 "RATE
 "(a) For all gas delivered hereunder, each month, in Indiana, Ohio and Michigan:
 "for that number of therms herein defined as 'base load' one and eighty-five hundredths (1.85) cents per therm.
 "for that number of therms in excess of 'base load' two and six tenths (2.6) cents per therm.
 "(b) Determination of 'base load' for each billing month.
 "(1) The 'daily base load' applicable to each period of twelve (12) billing months shall be the average number of therms

delivered per day during the four (4) consecutive months of June to September, both inclusive, immediately preceding such period. Provided, however, if the Company, due to its inability, or on its own initiative, fails to make delivery of normal requirements or agreed amounts, such curtailed deliveries and the days on which made shall be excluded in the determination of 'daily base load.'
 "(2) The daily base load shall be determined once each year as soon after October 1st as practicable, and the daily base load so determined shall be effective for the immediately succeeding twelve (12) months' period, beginning with the October billing month.
 "(3) The 'base load' shall be the daily base load multiplied by the number of days in the billing month or shall be the

computing the average daily delivery of therms [4] during the four consecutive months of June through September. This "daily base load" then applies to the succeeding twelve-months' billing period beginning October 1st and ending September 30th. During each billing month of such billing period the "daily base load" is multiplied by the number of days in the billing month. The resulting figure is the "base load" for such billing month, and Consolidated is charged at the rate of 1.85 cents per therm for gas delivered during the billing month up to the amount of this "base load." Deliveries in excess of this "base load" are charged at the higher rate of 2.6 cents per therm.

The effect of this rate differential is to encourage uniform consumption by Consolidated over the entire year. Insofar as the average daily deliveries during the succeeding billing period do not exceed the average daily deliveries during the four summer months of the "base load" period, all of Consolidated's purchases will be billed at the lower rate of 1.85 cents per therm. Since the use of natural gas for winter house-heating produces a pronounced seasonal variation in the demand, the normal expectation would be for winter deliveries greatly to exceed summer deliveries. Unless there was some inducement to spread the purchases out evenly over the entire year, Panhandle's facilities would be underutilized during the summer and would be taxed beyond their capacity during the winter.[5]

In addition to changing the rates to be charged by Panhandle, Rate Schedule Gd-1 of Supplement No. 5 provides that this rate schedule, which is the schedule governing sales on a "firm" basis, shall not apply to gas purchased by Consolidated from Panhandle for resale to an individual customer whose present or estimated annual use of gas exceeds 1,200,000 therms, unless such gas requirements were purchased by Consolidated from Panhandle on a "firm" basis prior to October 1, 1945.[6] This provision would, if effective, relieve Panhandle of its contractual obligation to deliver to Consolidated up to 125,000,000 cubic feet of gas per day to the extent that any such deliveries were destined for resale by Consolidated in violation of this provision. Indeed, it would impose upon Panhandle a duty not to make such deliveries. That is the construction placed upon this provision by the Commission,[7] and although I may not be

---

total number of therms delivered, whichever is less."

4. A measuring unit which reflects the heating value of gas.

5. With the benefit of such an inducement it is profitable for utilities like Consolidated to build storage facilities, as Consolidated has done, so as to be able to take a maximum amount of gas during the four summer months and thus improve their "base load" factor.

6. Rate Schedule Gd–1
 "Applicable
 "(a) This rate schedule shall apply to all natural gas purchased on a firm basis by the Utility for resale to domestic and other customers, except such natural gas as the Utility shall purchase, under any other rate schedule of the Company available to the Utility.
 "(b) Subsequent to October 1, 1945, the Utility, at its option, may purchase gas under this rate schedule for resale to any individual customer whose present,

or estimated, annual use of gas is less than one million two hundred thousand (1,200,000) therms and whose gas requirements were purchased by the Utility from the Company on an interruptible basis prior to October 1, 1945.
 "(c) This rate schedule shall not apply to gas purchased by the Utility from the Company for resale to any individual customer whose present, or estimated, annual use of gas exceeds one million two hundred thousand (1,200,000) therms, unless such gas requirements were purchased by the Utility from the Company on a firm basis prior to October 1, 1945."

7. In a letter by the Commission to Panhandle, dated August 8, 1947 Panhandle is warned against making sales to Consolidated on a "firm" basis in violation of Supplement No. 5 of Rate Schedule No. 12. The letter in part reads:
 "The Commission interprets this schedule as providing, among other things, that Panhandle may not sell and Michi-

bound by the Commission's interpretation, it carries considerable authority.

Panhandle is now suing for amounts allegedly due under the terms of the foregoing Agreement and the supplements thereto on account of gas delivered to Consolidated during the years of 1946 through 1949.

First, Panhandle declares that the amounts owing to it for deliveries to Consolidated during the billing period from October 1, 1946 through September 30, 1947[8] and the billing period from October 1, 1947 through September 30, 1948[9] were underestimated and that there is due a balance of $1,120,174.82 plus interest for such deliveries. Panhandle asserts that during each of the applicable four-months "base load" periods,[10] during which the "base loads" for the respective billing periods were determined, Consolidated received and sold gas to individual purchasers in violation of the 1,200,000 therms provision of Schedule Gd-1. It is Panhandle's position that Schedule Gd-1 forbids the inclusion of such deliveries in the computation of the applicable "base loads" and that Consolidated, consequently, had the benefit of "base loads" for the respective billing periods which were larger than it was entitled to have. The result of this improper inflation of the "base loads," the argument goes, is that Consolidated paid for large volumes of gas delivered during the disputed billing periods at the rate of 1.85 cents per therm instead of at the higher rate of 2.6 cents per therm. Panhandle requests that the "base loads" for these periods be recomputed to exclude deliveries taken in violation of the

1,200,000 therms provision; that Consolidated be held liable for all deliveries in excess of these reduced "base loads" at the higher rate of 2.6 cents per therm; and that Panhandle recover the difference between the amount paid and the larger amount to which it would be entitled as the result of such a recomputation.

The "base load" provision and the 1,200,000 therms limitation are entirely unrelated in their objectives. The former is designed to encourage maximum uniform utilization of Panhandle's facilities throughout the year; the latter is designed to prevent the unfair monopolization of a restricted supply of gas by large industrial purchasers to the detriment of smaller consumers. If enforced, the 1,200,000 therms limitation would require Consolidated to store during the summer months the gas which it takes to improve its "base load" factor instead of selling it immediately to large industrial purchasers. It was the intention of the Commission that such gas would then be available for smaller consumers during the winter heating season. However, regardless of how Consolidated might dispose of these disputed deliveries, Panhandle would reap the same economic benefits since Consolidated's increased summer consumption contributed to the operation of its facilities at maximum uniform capacity throughout the entire year.

■ The gist of Panhandle's contention is that Consolidated should be penalized for having received gas during the respective "base load" periods for resale in violation of the 1,200,000

gan Consolidated may not purchase natural gas on a firm basis to supply the requirements of an individual customer using more than 1,200,000 therms per year unless such individual customer was using more than 1,200,000 therms per year and such requirements were being supplied from gas purchased from Panhandle on a firm basis prior to October 1, 1945."

On August 19, 1947 the Commission filed a suit in the United States District Court for the Eastern District of

Michigan to restrain Panhandle and Consolidated from delivering and accepting gas in violation of this provision as construed by the Commission.

8. Count I.

9. Counts II, III & V.

10. (1) June 1, 1946 through September 30, 1946 for the billing period October 1, 1946 through September 30, 1947; and (2) June 1, 1947 through September 30, 1947 for the billing period October 1, 1947 through September 30, 1948.

therms limitation. However, there were adequate independent remedies for the enforcement of the 1,200,000 therms limitation without adapting the "base load" rate system to this end. Notwithstanding Consolidated's resistance to Panhandle's request for inspection of Consolidated's books, records and charts—which it was entitled to inspect pursuant to Article VIII (3) of the Agreement of 1935—Panhandle could have petitioned, as indeed it was its duty to petition, for judicial intercession to compel compliance with its request for such inspection. In addition, proceedings for a restraining order of the type actually started against Panhandle and Consolidated by the Commission in 1947 (See footnote 7) could have been brought more promptly. Not having resorted to the available means for preventing improper deliveries, Panhandle will not now be heard to assert that the 1,200,000 therms limitation must be construed so as to bring a profit to it at the expense of Consolidated.

■ Not only was it not contemplated that the "base load" rate system be used for such enforcement purposes,[11] but I have no authority thus to adapt it. Schedule Gd-1 does not specify how deliveries in violation of the 1,200,000 therms limitation are to be charged. In Supplement No. 5 the Commission found only two categories of rates to be reasonable: (1) the "firm" rate consisting of the "base load" rate of 1.85 cents per therm used in conjunction with the rate of 2.6 cents per therm for deliveries in excess of "base load"; and (2) the "interruptible" rate of 1.65 cents per therm. Panhandle does not contend that the effect of the 1,200,000 therms limitation is to make the entire "firm" rate

schedule inapplicable to wrongful deliveries and to make the "interruptible" rate of 1.65 cents per therm applicable. Rather, Panhandle asks that I establish a third category of rates which would make partial use of the "firm" rate schedule but would exclude from the "base load" all deliveries during the four summer months in violation of the 1,-200,000 therms limitation, resulting in an increased charge to Consolidated for deliveries during the succeeding twelve-months billing period. In the absence of any finding and order by the Commission that this would be the reasonable rate to apply under such circumstances, I am restricted to the existing rate schedules. I have no authority to rearrange them in the manner urged upon me by Panhandle.

But even if I were to accept the construction of this provision advanced by Panhandle, I find that of all the disputed deliveries the only customers who did not take gas from Consolidated in excess of 1,200,000 therms per year prior to October 1, 1945 were Pfeiffer and Solvay. Therefore, Consolidated was entitled by the very terms of this provision (see footnote 6, "Applicable (c)") to make the other disputed deliveries.

■ At the risk of burdening an already lengthy discussion, I must add that I am of the opinion that Panhandle's claim for a recomputation of the "base loads" and the amounts due from the Consolidated for these billing periods must be rejected for yet another reason. That part of the order establishing the 1,200,000 therms limitation is not effective to modify the unqualified contractual right of Consolidated to receive 125,000,000 cubic feet of gas a day on a firm basis. Although Section 717d [12]

11. There is substantial doubt if it would even be effective in this respect. As long as Consolidated was careful that the gas taken and stored during this four-months summer period for the purpose of improving its "base load" factor was not sold in violation of the 1,200,000 therms limitation, it could devote all of the gas taken during the other months to im-

proper uses without fear of suffering a rate penalty.

12. 15 U.S.C.A. § 717d
 "(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed,

confers upon the Commission the statutory authority to promulgate such an order incidental to its power to regulate the rates at which Panhandle's interstate sales to Consolidated are made,[13] the order must be based upon an express finding that a given contractual provision is unjust, unreasonable, unduly discriminatory or preferential. The order of November 2, 1945 putting this limitation into effect is based upon the findings of the order of September 23, 1942 prescribing an over-all reduction in Panhandle's rates and charges. The only finding made there as to existing relationships between the parties is as follows:

> "The rates and charges made, demanded, or received by the respondent for or in connection with their transportation and sale of natural gas in interstate commerce for resale for ultimate public consumption are unjust, unreasonable and excessive."

Although the foregoing finding may be sufficient to justify the new rates and charges, it is not such an express finding with respect to Panhandle's delivery commitments under the then existing contract as is required by Section 717d before the Commission can modify and supersede such contractual obligation.[14]

■ The belated clarification of Supplement No. 5 which is contained in the Commission's letter of August 8, 1947 (See footnote 7) does not cure the foregoing defect. An express finding accompanying the order is imperative not only to insure that a matter of such gravity has been given the hearing and consideration which it merits but also to eliminate all doubt as to the order's meaning. The presence of such doubt with respect to the provision in dispute is illustrated by the conflicting versions of this order, persuasive evidence of each version having been submitted at the time of the trial.

The right of Consolidated to petition for a rehearing and for review in the appropriate United States Court of Appeals under Section 717r was subject to a narrow time limitation. That time had long expired when the Commission's letter of August 8, 1947 was received. In the light of the confusion with respect to the significance of the order up to that

---

charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however*, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

13. Consolidated has urged that such a limitation on the right of resale to certain purchasers is a regulation of the local distribution of gas which is forbidden by Section 717(b). Although the 1,200,-000 therms limitation may have an indirect effect upon Consolidated's local distribution of gas, it is applied to Panhandle's interstate sales and it is imposed as one of the conditions upon which such sales are made. The authority to prescribe reasonable conditions on Panhandle's sales of gas to insure that service to all purchasers from Panhandle shall be adequate and impartial is "a necessary concomitant in the fixing of reasonable rates." See Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784, 789.

14. See Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235; Atchison, Topeka & Santa Fe Railway Co. v. United States, 295 U.S. 193, 201–202, 55 S.Ct. 748, 79 L.Ed. 1382; Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943, 954.

time and the influence it may have had on Consolidated's decision not to appeal under Section 717r, the failure of the Commission to make the requisite express finding must be deemed to have prejudiced Consolidated's rights under the Act.

Since the disputed deliveries were properly made to Consolidated on a "firm" basis and were properly included in the computation of the disputed "base loads" and since Consolidated has already paid for all the deliveries made to it during the two disputed billing periods in accordance with the effective rate schedules and supplements, I hereby find for Consolidated on Counts I, II, III and V.

Next, Panhandle claims that Consolidated owes it the amount of $601,354.39 plus interest for deliveries during the months of July through October of 1948.[15] Consolidated admits that payments in this amount were due to Panhandle. However, it contends that Panhandle's deliveries during this period fell below the 125,000,000 cubic feet per day required under the Agreement and that it was entitled to withhold certain amounts from such payments as a set-off against its cost of manufacturing gas to compensate for Panhandle's deficient deliveries. Consolidated advances this right of set-off under Paragraph 4 of Article XVIII of the 1935 Agreement [16] which makes Panhandle liable for loss or expense resulting from its failure to deliver gas in the volumes Consolidated may require up to the limits provided in the Agreement and, also, under Paragraph 2 of Article XV [17] which makes a party liable for failure to fulfill its contract obligations, even though it might otherwise have been excused pursuant to a "force majeure" provision, when such party's concurrent negligence or lack of due diligence contributes to its inability to perform.

Other things remaining unchanged, there may have been merit to Consolidated's position. However, upon the enactment of the Natural Gas Act in 1937 the private contractual rights of the parties were subordinated to the overriding public interest in the regulation of the transportation and sale of natural gas in interstate commerce. On July 17, 1948, in proceedings separate from and undertaken for a different purpose than the proceedings attendant upon the 1,200,000 therms limitation, the Commission found in Opinion 166 that the obligation to deliver to Consolidated up to 125,000,000 cubic feet of gas per day was discriminatory in the light of the prevailing emergency gas shortage, and that Panhandle's compliance therewith would prevent it from serving its other purchasers fairly. In an order of the same date, which was incorporated into the Agreement as Supplement No. 11, it commanded Panhandle to divide between Consolidated and another purchaser, Michigan Gas Shortage

---

15. Counts IV and VI.

16. Article XVIII, paragraph 4.
 "If Seller shall at any time fail to deliver gas in volumes and/or at such pressures as Buyer may require up to the limits otherwise herein provided, Seller shall, unless relieved by the terms of Article XV hereof, reimburse and indemnify Buyer for any expenses, loss or damage which it may sustain by reason of such failure, including the expense of putting into operation any gas manufacturing equipment, and/or obtaining manufactured gas or natural gas to remedy such deficiency."

17. Article XV, paragraph 2.
 "Such causes or contingencies [beyond the control of the party] affecting the performance of this Agreement by either party, however, shall not relieve it of liability in the event of its concurring negligence or in the event of its failure to use due diligence to remedy the situation and remove the cause in an adequate manner and with all reasonable dispatch, nor shall such causes or contingencies affecting the performance of this Agreement relieve either party from its obligations to make payments of amounts then due hereunder; nor shall such causes or contingencies relieve either party of liability unless such party shall give notice and full particulars of the same in writing or by telegraph to the other party as soon as possible after the occurrence relied on."

Company, on a prescribed percentage basis the available supply of gas without regard for such contractual obligation.[18]

 Unlike the earlier order of the Commission of November 2, 1945 relating to the 1,200,000 therms limitation, the order of July 17, 1948 did contain the proper express findings making it effective to modify the contractual obligation in question. Furthermore, it was within the authority of the Commission under Section 717d thus to modify a contract which it found granted an "undue preference and advantage" to Consolidated.[19]

Despite the clear import of this order, Consolidated insisted that Panhandle maintain its deliveries up to 125,000,000 cubic feet of gas per day. When advised of this attitude, the Commission issued its supplemental Opinion 166–A on August 24, 1948 in which it declared:

"Clearly, our order of July 17, 1948, modifies the obligation of Panhandle to deliver 125,000 Mcf per day to Michigan Consolidated at Detroit and the invoking by Michigan Consolidated of Paragraph 4 of Article XVIII of the contract of August 31, 1935 (Panhandle's rate Schedule FPC No. 12) is precluded by such order. Furthermore, the action of Michigan Consolidated under Paragraph 4 of Article XVIII of the contract of August 31, 1935 (Panhandle's Rate Schedule FPC No. 12) and the action of Panhandle

in increasing deliveries of natural gas to Michigan Consolidated through reduction of deliveries to other customers is contrary to and in violation of the Commission's orders issued herein and the provisions of the Natural Gas Act.

\* \* \* \* \* \*

"The Commission's order of July 17, 1948, which prescribes the manner in which Panhandle shall make deliveries of natural gas to Michigan Consolidated and Michigan Gas Storage Company effectively modifies all provisions of Panhandle's Rate Schedule FPC No. 12, and supplements thereto which may be inconsistent with the provisions of that order including Panhandle's obligation to deliver 125,000 Mcf per day and including Paragraph 4 of Article XVIII of the contract of August 31, 1935, (Panhandle's Rate Schedule FPC No. 12), and Supplement No. 11 to such rate schedule accepted for filing under Commission order of July 23, 1948, likewise modifies any provision in such rate schedule inconsistent therewith."

Assuming *arguendo* the correctness of the foregoing opinion as to the significance of the order, Consolidated contends that Panhandle is nonetheless liable in damages because it was deficient in the performance of its responsibilities as measured by that very order and the

18. "(B) Until October 31, 1948, Panhandle Eastern Pipe Line Company shall make deliveries to Michigan Consolidated Gas Company at Detroit and to Michigan Gas Storage Company of such volumes of natural gas as may be available after making deliveries to all of its other customers east of its Edgerton Compressor Station (including deliveries provided for in Paragraph (a) hereof), pursuant to the provisions of the effective tariffs and contracts, as follows:

"Panhandle shall deliver to Michigan Consolidated 52% and to Michigan Gas Storage 48% of such available volumes of natural gas until such date as the total volumes delivered to both such companies from and after May 15, 1948, shall have reached a proportion of 55.6%

to Michigan Consolidated and 44.4% to Michigan Gas Storage; and, from such date until October 31, 1948, such volumes of gas as may be available for delivery to these two companies shall be delivered by Panhandle on a daily basis in the proportion of 55.6% to Michigan Consolidated at Detroit and 44.4% to Michigan Gas Storage. Any variation in the daily delivery to either customer from the aforesaid percentage shall be adjusted within seven days;"

19. Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784. See also Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 6 Cir., 1949, 177 F.2d 942.

remaining effective provisions of the Agreement. Consolidated asserts that Panhandle did not operate its existing facilities so as to make the maximum amount of gas available to Consolidated and that it did not undertake the construction of new facilities so as to increase the supply of available gas. Both of these issues were raised by Consolidated in a previous suit against Panhandle for specific performance of the Agreement. At that time the Court of Appeals for the Sixth Circuit determined that they were questions which were committed to the primary jurisdiction of the Commission.[20] The Court declared that it could not order Panhandle to construct new facilities nor direct how its present facilities were to be operated. Both matters involved intricate problems of service as between different users and different geographical sections and must be decided with the perspective and expertise which only the Commission could bring to such deliberations.

The authority of the Commission over these matters, as set out in that opinion, cannot now be by-passed under the guise of a proceeding for damages. To hold Panhandle liable in damages for the reasons advanced by Consolidated is but another way of regulating activities which Congress has entrusted to the Commission. Any private remedies in these premises which Consolidated might otherwise have had under the Agreement of 1935 must give precedence to the regulatory powers of the Commission, and Consolidated must secure Commission sanction for damage claims as well as claims for specific enforcement before it has standing to request the application of the coercive power of this Court. Otherwise, Panhandle may be penalized for alleged failure to perform its contract when such performance would have been contrary to the public interest and forbidden by the Commission.

Earlier in the instant case, Consolidated attempted to raise these same arguments by way of counterclaim. For the same reasons that I must now reject them, I found against Consolidated at that time and dismissed the counterclaim on a motion by Panhandle for summary judgment.

Therefore, I find for Panhandle in the amount of $601,354.39 on Counts IV and VI, but Panhandle's claim for interest on this amount is rejected. By the terms of Paragraph 2 of Article IX of the Agreement,[21] Consolidated is relieved of liability for interest on any bills which it in good faith disputes or against which it presents a counterclaim or set-off if it furnishes satisfactory surety bonds for payment of the disputed amounts. Consolidated has in all respects complied with such provision which is determinative of the liability of the parties with respect to interest.

Finally, Panhandle claims $157,541.16 plus interest for gas delivered from October 1, 1948 through September 30, 1949.[22] This claim turns upon the com-

---

20. Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784.

21. Article IX, paragraph 2.
"Should Buyer fail to pay the amount of any bill for gas rendered by Seller as herein provided, when such amount is due, interest thereon shall accrue at the rate of 6% per annum from the due date until the date of payment. If such failure to pay continues for 60 days after payment is due, Seller may, in addition to any other remedy it may have hereunder, suspend further delivery of gas until such amount is paid, provided, however, that if the Buyer shall, in good faith, either dispute the amount of any such bills or parts thereof, or present a counter-claim or offset against the same, and shall at any time thereafter within thirty (30) days of a demand made by Seller, furnish a good and sufficient surety bond, in amount and with sureties to be approved by Seller, conditioned upon the payment of any amounts ultimately to be found due upon such bills after a final determination, which may be reached either by agreement, arbitration award or judgment of the courts as may be the case, then such bills shall not be deemed to be due within the meaning of this paragraph unless and until default be made in the conditions of such bond."

22. Count VII

putation of the "base load" applicable to these deliveries. Ordinarily, the "daily base load" for this period would be determined by averaging the total daily deliveries for the months of June, July, August, and September of 1948. However, during July, August, and September the Commission's order of July 17, 1948 (see footnote 18) discussed with reference to the immediately preceding claim, was in effect. In conformance with this order, during certain days of those months deliveries to Consolidated were less than 125,000,000 cubic feet per day, and in computing the "daily base load" for this period Consolidated excluded such days from the average. The effect of this practice was to make the "base load" larger than it would have been if deliveries on those days had been included. Consolidated thereby had the benefit of the lower "firm" rate of 1.85 cents per therm for a larger portion of the deliveries during the succeeding billing period than it otherwise would have had.

Panhandle objects to this method of computing the applicable "base load" and contends that the actual volume of deliveries on each day during the "base load" period must be included in arriving at the average figure. If its method were adopted, the applicable "base load" would be smaller and the higher "firm" rate of 2.6 cents per therm would apply to a larger portion of the deliveries during the disputed billing period.

In that section of Rate Schedule Gd-1 of Supplement No. 5 which described how the "base load" is to be computed, there is a proviso which expressly excludes from the average those days when, due to Panhandle's inability or its own initiative, deliveries fall below the volumes agreed upon between the parties (see footnote 3). This proviso clearly comprehends a circumstance such as confronts us here wherein Panhandle limits its deliveries to Consolidated in obedience to the authority of the Commission.[23]

I do not agree with Panhandle's contention that the order of July 17, 1948 modified the foregoing proviso. This order is exclusively concerned with the equitable distribution of the available gas supply and it did not contemplate any change in the rates and charges or the method of computing them. Supplement No. 11 only superseded portions of preceding schedules and supplements which were inconsistent therewith. I do not find that the prevailing provisions for computing rates and charges were in any way inconsistent with the emergency provision regulating equitable distribution of the available gas supply.

The order of July 17, 1948 clearly contemplated that Panhandle would make available to Consolidated all the gas which the operation of its facilities at maximum capacity permitted. If deliveries fell below 125,000,000 cubic feet on certain days, it was, presumably, because Panhandle's facilities were taxed to capacity in supplying other purchasers. Such being the case, Panhandle was enjoying an optimum operating situation during these summer months, and the Commission had determined that under such circumstances a rate of 1.85 cents per therm for gas delivered during the succeeding billing period would allow a fair return on Panhandle's investment. To permit Panhandle to recover on the basis of the higher rate would give it an unreasonable rate windfall and would unfairly subject Consolidated to a penalty rate for not having taken its maximum deliveries during the "base load" period when it was at all times ready and willing to do so.

Panhandle's case would be more persuasive if the order of July 17, 1948 were phrased in terms of an explicit command to curtail deliveries to Consoli-

23. In this respect the problem is different from that presented in the determination of whether deliveries in excess of the 1,200,000 therms limitation were to be included in the "base load," since Gd-1 does not make provision for the treatment of deliveries which are alleged to be in excess of the contractual requirements.

dated by a prescribed amount. Rather, it directs Panhandle to deliver to Consolidated a given percentage of all the gas available after having supplied its other customers. This accorded a certain area of discretion to Panhandle as to the volume of deliveries to be made during the "base load" period. Thus, the adoption of Panhandle's method of computation would create an uneasy atmosphere in which it was to Panhandle's financial advantage to exercise its discretion so as to minimize deliveries to Consolidated during these crucial months. The mere presence of such a possibility would be conducive of friction between the parties, a condition which the Commission must have intended to avoid.

I therefore find for Consolidated on Count VII.

A form of order consistent with the findings here expressed may be presented for signature.