**SOUTH CAROLINA GENERATING COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION and Georgia Public Service Commission, Respondents.**

No. 7745.

United States Court of Appeals Fourth Circuit.

Argued Nov. 13, 1958.

Decided Dec. 19, 1958.

**916**

David W. Robinson, Columbia, S. C., and John W. Riely, Richmond, Va. (W. C. McLain, Columbia, S. C., David W. Robinson, II, Arthur M. Williams, Jr., Columbia, S. C., George D. Gibson, George C. Freeman, Jr., Richmond, Va., Robinson, McFadden & Dreher, Columbia, S. C., and Hunton, Williams, Gay, Moore & Powell, Richmond, Va., on brief), for petitioner.

Howard E. Wahrenbrock, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C., for respondents.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

On the prior appeal in this case, 4 Cir., 249 F.2d 755, we had before us a decision and order of the Federal Power Commission of October 24, 1956, 16 F.P.C. 52, which reduced the contract rate at which the Generating Company, a South Carolina corporation, furnished electric energy to Georgia Power Company, a Georgia corporation, from the Urquhart plant on the Savannah River near North Augusta, South Carolina. The rate was reduced from $22.50 to $21.948 per KWH per annum. We held that the Commission had the power to alter the rate fixed by the contract and to impose a new rate based upon the cost of service, and then considered specific objections that the new rate was unjust and unreasonable and did not afford a fair return to the producer. These objections related to:

(1) the amount allowed the utility for interest on funds used by the utility during the course of construction;

(2) the elimination from the contract of an automatic escalator clause designed to increase or decrease the rate in case of variations between the estimated and actual amount of investment and of expenses of operation of the plant; and

(3) the amount allowed by the Commission in its computation of income taxes which was fixed at the amount paid by the Generating Company as a separate entity rather than the amount paid by the corporate system as a whole, of which the Generating Company was a wholly owned subsidiary.

Upon an examination of the Commission's opinion, we did not find a completely satisfactory explanation of its

essential findings on these points and accordingly, in conformity with the practice approved in Colorado-Wyoming Gas Co. v. F.P.C., 324 U.S. 626, 634, 65 S. Ct. 850, 89 L.Ed. 1235, we suspended the Commission's order and remanded the case for further explanations. In response thereto the Commission filed a supplemental opinion and order on June 2, 1958, in which it offered additional explanations and reaffirmed its prior order. As to the matter of interest, the Commission explained that the allowance of interest at 6 per cent on the funds used during construction rather than the larger rate normally expected by investors upon an investment was in accord with established accounting practices and the decision of the courts. We accept this explanation.

As to the elimination of the escalator clause, the Commission pointed out that the contract adjustment clause related to variable factors of the contract rate and therefore could not be applied to the rate determined by the Commission on the basis of cost of service; and also that the Generating Company could at any time submit to the Commission a requirement or proposal for an adjustment clause that would reflect changes in cost of service. We accept this explanation.

We find, however, no adequate explanation of the Commission's position on the income tax matter. Nothwithstanding the fact that the Generating Company is merely a subsidiary corporation of an electric utility system, the Commission, in computing the cost of supplying the electric service, took into account only the income taxes which the Generating Company is obliged to pay as a separate corporate entity but failed to include the additional tax incurred by the corporate system as a whole because of the establishment and operation of the subsidiary body. As will appear from our earlier opinion, the Federal income taxes of the subsidiary corporation were $217,434 and the State income taxes $43,854, or a total of $261,288; but the taxes calculated on the system as a whole amounted to: Federal income taxes $398,002 and State income taxes $53,377, or a total of $450,379.

The additional tax burden on the system as a whole was caused by the circumstances under which the project was undertaken. It was initiated by the South Carolina Electric and Gas Company (E&G), a South Carolina corporation; and the Generating Company was incorporated as a fully owned subsidiary of E&G to put the project into effect. The plant had a rated capacity of 150,000 KW, which was supplied under contract between the Generating Company and the consumers as follows:

30,000 KW to E. 1. du Pont de Nemours & Company, primary contractor of the Atomic Energy Commission at its Savannah Hydrogen-Bomb Project,

45,000 KW to E&G, the parent body for distribution to its customers in South Carolina, and

75,000 KW to Georgia Power Company for distribution to its customers in Georgia.

The rate fixed by the contracts with these consumers consisted of an energy charge of $.00315 per KWH, which is not in dispute, plus a capacity charge. In the du Pont contract the capacity charge was fixed at $15.30 per KW per annum to which was added a fixed charge of $3.70 per KW, resulting in a total capacity charge of $19.00 per KW per annum. In the Georgia Power contract $7.20 per KW per annum was added to the basic capacity charge of $15.30 per KW per annum. The contract with the parent company (E&G) provided for a total capacity charge of $15.30 per KW per annum with no additional fixed charge. The larger price charged to Georgia Power was not due to greater costs of service but was fixed by contract between E&G and Georgia Power, wherein it was agreed that the net saving of $600,000 per annum made by Georgia Power by purchasing energy from the Urquhart plant rather than building and operating a generating plant of its own should be divided between E&G and Georgia Power.

It is shown in our prior opinion that this arrangement was advantageous to all parties concerned. Georgia Power, whose contract alone came within the jurisdiction of the Federal Power Commission, paid a higher contract rate than the others but it saved the substantial amount indicated above.

The Generating Company was incorporated as a subsidiary of E&G to construct and operate the plant because it was found that the low rates demanded by du Pont for the energy furnished to it would not be possible under conventional utility financing, since the bonded debt of E&G was restricted by its mortgage to 60 per cent of the total of any additions to its property. To meet this situation the Generating Company was formed with a debt ratio of 75 per cent in mortgage bonds and 15 per cent in ten-year notes, and with 10 per cent in common stock, all of which was purchased by E&G. This method of financing provided money at a low cost and made possible the lower rates acceptable to du Pont. It also resulted in lower income taxes of the Generating Company since its high interest payments were deductible from its taxable income. But, on the other hand, the income tax of E&G was increased because it was obliged to maintain a low debt ratio and a high common equity ratio in order to protect its financial standing and market the system's securities. This need was accentuated when the project was undertaken, for it then became necessary for the parent company to guarantee debt principal and interest and commitment fees of the undertaking, and also to provide funds for investment in the common stock of the subsidiary by the sale of equity securities. It became necessary for it to issue additional amounts of common stock to offset on a consolidated basis the high debt ratio of its subsidiary and therefore it did not have as large an interest deduction as it otherwise would, and hence paid higher taxes.

The result was that, in 1954 when the plant was completed the system capitalization ratio consisted of 62.8 per cent bonded debt, 9.4 per cent preferred stock, and 27.8 per cent common equity so that the interest payments of the system as a whole were relatively small and the income tax relatively high. For these reasons the utilities contended that the allowance to the Generating Company for income taxes should not be confined to those incurred by it as a separate entity, but should be increased by the sum of $189,091 so as to reflect the increased income tax burden imposed upon the system as a whole by the operation of the new project. The Commission rejected this contention and held that the allowance for income taxes should not exceed the taxes chargeable to the subsidiary alone. The Commission conceded that the two affiliated companies actually incurred tax costs in addition to those included in the estimate of the Generating Company's cost of service, but nevertheless adhered to the view that the tax allocated to a subsidiary company should not exceed the amount of the tax paid by it as a separate entity.

This conclusion was in sharp contrast with the position taken by the Commission in determining the rate of return to be allowed to the Generating Company on its investment (rate base). In determining this matter, the Commission treated the financial structure of the E&G system, composed of 62.8 per cent debt, 9.4 per cent preferred stock and 27.8 per cent common equity, as an entirety. It found that the actual cost of the debt was 3.46 per cent and the cost of the preferred stock 4.9 per cent, and held that an allowance of 10.5 per cent on the common equity to be sufficient to maintain the financial integrity of the system and to attract needed capital on favorable terms. In conclusion it said:

"Applying the rates found reasonable for debt preferred stock and common equity, and using the system capitalization ratio of 62.8%-9.4%-27.8%, we arrive at an allowance for overall rate of return of 5.55%."

In its supplemental opinion the Commission made further explanation of its

position on this point, which may be summarized as follows:

Although the Generating Company is legally a separate entity, financially it is part of and dependent on its parent, and investors are influenced by this fact especially as the parent company, amongst other things, guaranteed debt principal and interest commitment fees and supplied assurance that equity funds would be provided as needed to complete the project. Experience shows that utility companies with high debt ratios and thin equities can raise their funds at an overall cost lower than companies with normal ratios. The higher cost of the debt of the former companies is more than offset by the thinness of the equity because the leverage of the thin equity permits large returns on the common stock. In view of these facts it would not be fair to allow the Generating Company a rate of return on the costs of its abnormal 90 per cent debt and 10 per cent equity based on the usual earnings-price ratio of electric utilities having more normal equity ratios, since the greater security of the latter attracts capital despite the lower returns. The thinner equity of the Generating Company with its greater risks requires a higher rate than the usual equity security on the market. For these reasons the determination of the rate of 5.55 per cent was made by taking into consideration the financial structure of the system as a whole.

We come now to the explanation offered by the Commission in its supplemental opinion for its conclusion that the income tax allowance should be restricted to the amount paid by the Generating Company alone and should not include the extra taxes incurred by E&G when it increased its equity capital ratio in order to finance the construction of the new plant. The Commission first asks the question whether these extra taxes enter into the cost of the service rendered by the Generating Company to Georgia Power, and answers the question in the negative. Its reasons may be summarized as follows:

It says that the underlying and controlling purpose of E&G in financing the Urquhart plant was to improve its own financial standing and broaden its own market. For this purpose it changed its capital structure and incurred the extra tax cost so that it might finance the new enterprise at a lower cost and enable it to charge lower rates to du Pont. Thereby it obtained a large power contract from a "blue chip" customer and obviated the possible incursion of a competing utility into its territory and also improved its own market in the area adjacent to the A.E.C. project on the Savannah River. It follows that the extra tax costs were incurred by E&G for its own benefit and are not a cost of the service rendered to the Georgia Power Company. Indeed, it was not originally intended that any part of the power produced by the Urquhart plant should be furnished to Georgia Power, but when it was found that du Pont did not need as much power as had been expected the excess was sold to Georgia Power. However, the benefit of the low costs which were given to du Pont were denied to Georgia Power, and hence the extra costs should not be considered in determining the purchase price which Georgia Power should pay.

We are unable to follow this line of reasoning. It seems to us to involve a *non sequitur*. Undoubtedly E&G undertook the risks and assumed the burdens of the new enterprise in order to improve its financial standing and broaden its market, and undoubtedly it achieved these ends. But these facts do not relieve Georgia Power from the obligation to pay a fair and reasonable price for what it gets based on the costs of the product, which include taxes on income. Moreover, not only E&G but du Pont and Georgia Power received substantial benefits from the success of the venture which E&G undertook. Du Pont got a lower price under the contract than it would have received had the price been originally determined by regulatory body under the orthodox methods. In this respect the situation resembles that before the court in United Gas Pipeline Co. v.

*Mobile Gas Co.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, cited in our earlier decision, where the Supreme Court held that the utility should be held to a contract rate for gas supplied to a particular consumer although it was lower than that charged for other gas, unless the contract rate was found to be unjust, unreasonable, unduly discriminatory, or preferential under the statute. Georgia Power also benefitted from the arrangement because it received electric energy at a cost less than Georgia Power could have produced it by building its own plant. Hence the Commission's conclusion cannot be sustained, if the benefit to the consumer rather than cost of service is the governing factor.

We think, moreover, that this line of argument approaches the problem from the wrong angle. When the Commission struck down the Georgia Power contract rate as unreasonably high, it announced that the rate should not be based on the value of the service but upon the cost of the service, and that the cost of service should include, amongst other things, an allowance for income taxes. But now the Commission takes the position that Georgia Power should not bear that part of the cost of service involved in the extra income taxes incurred by the utility system. We do not think that this position can be sustained, especially as the Commission itself has found that in order to fix a fair and just rate of return for the enterprise it is essential to recognize the fact that the Urquhart plant was financed and is being operated by a system which for practical purposes should be considered as a single entity. The Commission's supplementary opinion fails to reconcile this inconsistency.

■■ When the Commission rejects the contract rate as being unreasonably high because it exceeds a reasonable rate upon the cost of service and disregards the benefit of such service to the purchasing utility, it is at least incumbent upon the Commission to give proper consideration to all costs actually incurred in the rendition of the service. If the Commission looks at the cost of service alone as the standard of reasonableness of the contract rate, then actual costs should not be disregarded simply because the selling utility chooses to incur them in one place rather than another. The additional income tax is an unavoidable consequence of the service and whether E&G elects to incur that cost directly or only indirectly through its wholly owned subsidiary, the relation to the total cost of service is the same.

■ The Commission repeatedly looks through the corporate form of affiliated corporations joined in a single system in order to recognize economic realities. Thus in determining the rate of return on the investment the Commission treats the overall cost of money in the system as a whole. *F.P.C. v. Natural Gas Pipeline Co. of America*, 315 U.S. 575, 596–599, 62 S.Ct. 736, 86 L.Ed. 1037; *F.P.C. v. Hope Natural Gas Co.*, 320 U.S. 591, 604, 64 S.Ct. 281, 88 L.Ed. 333; *Safe Harbor Water Power Corp. v. F.P.C.*, 3 Cir., 179 F.2d 179; *Pennsylvania Water & Power Co. v. F.P.C.*, 343 U.S. 414, 424, 72 S.Ct. 843, 96 L.Ed. 1042. The Commission disregards corporate forms in order to exclude from costs claimed by one member of a corporate system payments which represent profits to another affiliate of the system. *Alabama Power Co. v. McNinch*, 68 App.D.C. 132, 94 F.2d 601, 616–618; *Puget Sound Power & Light Co. v. F.P.C.*, 78 U.S.App. D.C. 143, 137 F.2d 701, 703; *Niagara Falls Power Co. v. F.P.C.*, 2 Cir., 137 F. 2d 787; *Pennsylvania Power & Light Co. v. F.P.C.*, 3 Cir., 139 F.2d 445, 450; *California-Oregon Power Co. v. F.P.C.*, 9 Cir., 150 F.2d 25, 27; *Alabama Power Co. v. F.P.C.*, 5 Cir., 134 F.2d 602, 609. In a number of instances the Commission has required the subsidiary body to take the tax allowance of the system where the system debt ratio was higher, and income tax lower than that of the subsidiary. In the Matter of Hope Natural Gas Co., 10 F.P.C. 583, 612; In the Matter of Penn York Natural Gas Co., 5 F.P.C. 33, 38–39. State commissions also customarily determine income taxes for rate making purposes by assuming that the system

debt ratio applies to the subsidiary. See in Re Diamond State Telephone Co., 21 P.U.R.3d 417, 440, where it was said:

"The question presented by this issue narrows to this—may we, as a part of the regulatory process, fix rates upon the assumption that the company had in its capital structure debt in proportion to the debt of the Bell System and may we, therefore, calculate the company's operating taxes on this basis. As previously stated, the company itself urges this same theory for the purpose of determining its fair rate of return. On that phase of the case, we adopted the company's position. We think that not only justice and equity to the consumer but also consistency, as well, compels us to adopt the same theory here."

The matter is well summed up in the report of the Presiding Examiner of the Commission as follows:

" * * * This case is concerned with determining whether the charges paid by Georgia Company will compensate fairly the system enterprise in South Carolina which financed and operates the plant which supplies Georgia Company with 75,000 kw of electric energy, and conversely whether those charges exceed the system's cost to serve Georgia Company. To so design accounting elements as to technically satisfy the subsidiary's 'costs,' while leaving the parent uncompensated for costs directly resulting from creating, financing (with system credit and financial backing), and managing the generating subsidiary is neither moral nor legal, regardless of how regular and routine the accounting procedures are. To use any other than system ratios in computing interest deductions for income tax expense allowances, to use only the subsidiaries interest deductions and ignore the high-debt-financing effects upon the parent company's tax computations would be to meas-

ure the fairness here sought by distorted and untrue or half-true facts. * * * * ”

It should be borne in mind that the Georgia Power Company will not be saddled with all of the increased tax costs resulting from the creation of the subsidiary corporation, if the system's contention is sustained. The position of the petitioning utilities is that the increased tax costs should be spread over the whole E&G system from which Georgia Power receives one-half of the output of the Urquhart plant. When this is done Georgia Power will pay only one-half of the increased income tax costs of the E&G system attributable to the Generating Company.

The order of the Commission is stayed and the case is remanded for further proceedings as indicated in this opinion.