281 F.2d 567
 EL PASO NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
SOUTHERN CALIFORNIA GAS COMPANY, and Southern Counties Gas Company of California, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
PEOPLE of the State OF CALIFORNIA and Public Utilities Commission of the State of California, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
 No. 18022.
 No. 18120.
 No. 18124.
 No. 18125.
 United States Court of Appeals Fifth Circuit.
 August 2, 1960.
 Rehearing Denied in No. 18125
 September 30, 1960.
 
 William M. Bennett, Roderick B. Cassidy, Harold J. McCarthy, J. Calvin Simpson, San Francisco, Cal., for people of Cal. and Public Utilities Commission of Cal.
 Leo E. Forquer, Atty., Willard W. Gatchell, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, F. P. C., Washington, D. C., for respondent.
 Gregory A. Harrison, San Francisco, Cal., Allen R. Grambling, El Paso, Tex., Malcolm T. Dungan, San Francisco, Cal., George D. Horning, Jr., Washington, D. C., Brobeck, Phleger & Harrison, San Francisco, Cal., Hardie, Grambling, Sims & Galatzan, El Paso, Tex., Hogan & Hartson, Washington, D. C., for El Paso Natural Gas Co.
 H. F. Lippitt, II, T. J. Reynolds, H. P. Letton, Jr., L. T. Rice, Milford Springer, Robert M. Olson, Jr., Los Angeles, Cal., for Southern Cal. Gas Co. and Southern Counties Gas Co. of Cal.
 Frederick T. Searls, Malcolm H. Furbush, Frederick W. Mielke, Jr., Malcolm A. MacKillop, San Francisco, Cal., for Pacific Gas & Elec. Co.
 Before TUTTLE, CAMERON and WISDOM, Circuit Judges.
 TUTTLE, Circuit Judge.
 
 
 1
 These petitions deal with the proper computation of the rate to be charged to the ultimate consumers of gas, principally residents of the State of California, for the period April 15, 1955-December 31, 1957, for gas produced and transmitted and sold by El Paso Natural Gas Company, an integrated Natural Gas Company.
 
 
 2
 Without expressly identifying the proponent of each separate contention, the principal questions here raised are the treatment to be accorded by the Federal Power Commission in a Section 4 proceeding[1] to certain Federal income tax benefits. The company contends that once the Commission has arrived at a rate that represents the ordinary revenue requirements necessary to reimburse it for all of its operating costs and a reasonable return on its investment, it must fix a rate that will yield this amount and must also permit the company to retain for the benefit of its equity owners the tax savings it achieves from the statutory depletion allowance, from the current deduction of intangible drilling expenses and from use of an optional rapid method of depreciation. The California Commission contends that the parties acquiesced in a 6% return on the entire investment, including the production or well-mouth properties, and that all tax savings must be given effect in arriving at the actual cost of operation; thus all amounts in excess of the sum necessary to return actual costs including a 6% return on the investment must be refunded. Other parties take several intermediate positions. The legal conclusions which we reach will resolve these several contentions without the necessity of separately discussing them all.
 
 
 3
 The Commission's order gave effect to the tax savings differing in important respects from the contentions of all of the parties. It held that the 6% rate of return was, in light of acquiescence of all parties, a proper rate of return on the investment before giving consideration to the special circumstances surrounding that part of the investment that represents the ownership of the gas in place and the production facilities. It figured this investment at $74,436,273. It also recognized that special incentives are necessary for the producing end of the integrated business by way of higher return to encourage exploration and drilling of new wells. It equated the special tax savings from depletion and deduction of intangible drilling expense, provided for by Congress as tax benefits in the oil and gas industry, to the ordinary 6% return plus the needed incentive, and allowed the amount represented by these two tax savings to be retained by the company but to be treated as if actually paid in federal taxes. This amount, which represents 8.61% of the $74,436,273 well-mouth investment, was allowed as the return on that investment in lieu of the 6% rate, thus making an overall rate of return on the total investment of $549,563,775 for rate making purposes of 6.35%.
 
 
 4
 The Commission's order also permitted El Paso to take advantage of the rapid depreciation provisions of the 1954 Internal Revenue Code[2] by permitting it to treat its taxes for rate making purposes as though depreciation had been figured on the "straight line" method, but it imposed the requirement that the savings in taxes for the test year be credited to a special reserve account so as to be available for payment of the higher taxes later when the higher depreciation figure could no longer be deducted.
 
 
 5
 El Paso contends that the requirement that these savings be placed in reserve was invalid and it claimed the privilege of retaining them for its general corporate purposes without restriction. Intervenors contended that only the actual taxes paid under the rapid depreciation schedule should be allowed as operating expenses, and that the company should not be permitted to retain these savings without their being given effect in the rate making process.
 
 
 6
 All parties present their cases here on the theory that we have an uncomplicated legal question as to how to treat the tax savings benefits which Congress clearly sought to afford either this particular industry or to businesses generally (as to the rapid depreciation option) in the making of just and reasonable rates for the sale of natural gas in interstate commerce.[3]
 
 
 7
 We have heretofore in Bel Oil Corp. v. Federal Power Commission, 5 Cir., 255 F.2d 548, 553, and in Gulf Oil Corp. v. Federal Power Commission, 5 Cir., 255 F.2d 556, 557, stated that the problem of "the regulation of the prices at which thousands of `natural gas companies' may sell to the pipe line companies is a difficult one at its best," and that the standard of what is a just and reasonable rate "is concededly a difficult standard to specify especially in light of the fact that producers are in reality selling gas that they own and are not, in the traditional sense, primarily furnishing a service to the public." Yet that is precisely the problem with which the Commission had to cope in this case. So far as relates to that element of cost of service that represents the price at which the gas is to be delivered to the transmission lines of El Paso after production is completed the so-called well-mouth investment of El Paso may be viewed as if it were the property of an independent regulated producer. We dealt with such producers in the Bel Oil and associated cases, 255 F.2d 548, et seq.
 
 
 8
 El Paso contends, the Commission recognizes, and the State of California and other intervenors do not dispute, that in ordinary circumstances the producer is entitled to a rate that permits him to recover his costs and a reasonable return on his investment, which return must include an increment of incentive for exploration and development and compensation for the wasting asset. Here, however, the parties differ widely on what, on the record before us, El Paso is entitled to as representing this increment. El Paso says it is entitled to 6% on the $74,436,273 well-mouth investment, plus $7,704,477, representing savings in taxes for which it should not have to account in computing cost of service. The Commission says it is entitled only to the $7,704,477 tax savings (of which $1,297,717 is to be placed in a reserve as above discussed), representing 8.61% of the well-mouth investment as compared with the 6% rate allowed on the remaining investment.[4] The State of California contends that only the 6% rate of return on the entire investment, including well-mouth, is warranted because it says, "It was stipulated by all parties to the proceeding below, including El Paso, that an allowance for return should be included in the cost of service to provide El Paso with a 6 per cent rate of return on its entire rate base." Other intervenors make this same contention.
 
 
 9
 While it may be said that all parties participated in the hearing below on the assumption that an overall rate of return of 6% would be applicable, we do not think this forecloses El Paso's right to urge the necessity of fixing a higher rate on the well-mouth investment. This is so because all parties were on notice that El Paso was proceeding on a theory that would have entitled it to realize in addition to the 6% return the tax savings of $7,704,477 by including this item in its cost of service, although it did not actually pay this sum. Thus El Paso was claiming the right to retain the additional sum and we do not think El Paso is bound by its claim for a 6% rate overall if we find the theory by which it sought to obtain its incentive and depletion was the wrong approach.[5]
 
 
 10
 We thus come to the question: What effect must the Commission give to the tax incentives provided by Congress for the gas industry, as relates to the percentage depletion and intangible drilling expense items and to taxpayers generally, as relates to the rapid depreciation item in arriving at a just and reasonable rate?
 
 
 11
 We think that full effect must be given to the Congressional intent to make the several tax savings available to this taxpayer either because it is in the natural gas business or because it is acquiring new equipment subject to the depreciation options of the 1954 Act.
 
 
 12
 We think, however, that this does not mean that these tax benefits are to be translated into additional profits for the regulated company over and above a reasonable return on its investment. They are available to the regulated companies to make it so much the easier for them, in competition with other fuels and in competition with other industries seeking the investor's dollar to earn a fair return, including the substantial increment of incentive for exploration and development and payment for gas consumed.
 
 
 13
 It has long been held that in rate making and regulation there must be included an item representing depletion of a wasting asset. See Dayton Power & Light Co. v. Public Utilities Comm. of Ohio, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, and Columbus Gas & Fuel Co. v. Public Utilities Comm. of Ohio, 292 U.S. 398, 54 S.Ct. 763, 767, 78 L.Ed. 1327. In the latter case the Supreme Court said:
 
 
 14
 "To withhold from a public utility the privilege of including a depletion allowance among its operating expenses, while confining it to a return of 6½ per cent upon the value of its wasting assets, is to take its property away from it without due process of law, at least where the waste is inevitable and rapid."
 
 
 15
 It has also been recognized not only by Congress but by the courts as well that there is a public interest in the creation of an incentive to cause additional exploration and development in the oil and natural gas industries. We agree with the statement contained in the opinion of the Commission in this case as to the legislative history showing the Congressional purpose and intent:
 
 
 16
 "The percentage of income depletion deduction has had a long history which indicates that it is designed to encourage the exploration for and the development of oil and gas properties. The Revenue Act of 1916 (39 Stat. 756, 759), which first recognized the depletion of oil and gas, required the use of cost or value as of March 1, 1913, as a basis for depletion. With the Revenue Act of 1918 a change was made so as to allow depletion based upon the fair market value of the property at the date of the discovery known as `discovery depletion' (40 Stat. 1057, 1068). The legislative history of this Act emphasizes the hazards of the industry and the need for incentives to prevent the end of prospecting and wildcatting, 56 Cong.Rec. 10339, 10539-10542. The `discovery depletion' provision was reenacted in the 1924 Act (43 Stat. 253, 260) with the recognition of the large risks in the oil and gas business, 65 Cong.Rec. 2429. In the Revenue Act of 1926 (44 Stat. 9, 16) `percentage depletion' at 27½ percent was introduced to avoid some of the administrative difficulties of `discovery depletion' (S.Rep. 52, 69th Cong., 1st Session, pp. 17-18; 67 Cong.Rec. 3018-3019). It was noted by the House Ways and Means Committee in reporting the 1926 bill, that the purpose of discovery depletion was to encourage the wildcatter or pioneer (H.Rep. No. 1, 69th Cong. 1st Session, p. 6). In connection with the 1934 Revenue Act (48 Stat. 680, 710) the peculiar risks and hazardous character of the industry were recognized (78th Cong.Rec. 6181-6183)."
 
 
 17
 The most recent statement of the Supreme Court as to the purpose of percentage depletion is in United States v. Cannelton Sewer Pipe Co., 80 S.Ct. 1581, 1584:
 
 
 18
 "In summary, mineral depletion for tax purposes is an allowance from income for the exhaustion of capital assets. Anderson v. Helvering, (1940), 310 U.S. 404 [60 S.Ct. 952, 84 L.Ed. 1277]. In addition, it is based on the belief that its allowance encourages extensive exploration and increasing discoveries of additional minerals to the benefit of the economy and strength of the Nation. * * *"
 
 
 19
 El Paso contends that this policy means that it is entitled to keep the tax benefits thus granted to it as a gas producer over and above an amount charged for its gas that would represent a reasonable return on its investment. We hold that this does not follow. It is manifestly the intent of Congress that the sale of natural gas in interstate commerce shall be regulated in such manner as to prevent prices to be charged that are not just and reasonable rates. However, as we have stated, such reasonable rate must include an increment representing compensation for the depletion of the gas supply. Dayton Power & Light Co. v. Public Utilities Comm. of Ohio, supra. Traditionally, also, reasonable return has always included an increment to attract capital to the venture. In the gas industry this is the incentive item we have discussed above. See City of Detroit v. F. P. C., 97 U.S.App.D.C. 260, 230 F.2d 810. The requirement that the Commission determine a just and reasonable rate is not modified by reading into the statute an exception to the extent that the prices charged may be sufficient to afford a just and reasonable rate plus an amount representing a savings in taxes granted to the gas industry. We think there is nothing in the legislative history that would warrant our concluding that Congress intended the statutory depletion, deduction of intangible drilling expense, and rapid depreciation provisions of the Revenue laws to amend or modify the express language of the Natural Gas Act, which provides:
 
 
 20
 "§ 717d. Fixing rates and charges; determination of cost of production or transportation.
 
 
 21
 "(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: Provided, however, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates." 15 U.S.C.A. § 717d.
 
 
 22
 We think, in short, that there is no statutory authority for the Commission to treat actual savings in taxes to which natural gas companies are entitled any differently than savings in any other cost of service. It is the obligation of all regulated public utilities to operate with all reasonable economies. This applies to tax savings as well as economies of management. The net result of this, of course, is that such savings as are effected are passed on to the consuming public. This we consider to be the natural and necessary consequence of rate regulation.
 
 
 23
 What we have here concluded does not, of course, reach the question: What is the just and reasonable rate to be charged? It may be that what the Commission set as a just and reasonable rate as to the well-mouth properties is the correct figure, but there is nothing in the record to support it, and the rationale by which the Commission arrived at the figure of 8.35% we have seen to be incorrect. It is the duty of the Commission to fix a rate that represents the cost of service and a reasonable return on the investment, including compensation for consumption of the gas and an increment for incentive, instead of merely treating the tax savings as the amount necessary to provide for return and incentive. This can be done only by making the necessary inquiry directed to this issue, building up a proper record, and making findings on the amount actually necessary to provide these items.
 
 
 24
 We conclude that the two true tax savings are to be treated alike. Other than the depreciation item, whatever federal income taxes were actually paid for the test year should be treated as part of the cost of service regardless of whether these taxes were less than would have been paid but for the depletion allowance and the deduction for intangible drilling expense. No theoretical amount not actually paid can be so included.
 
 
 25
 The one exception, if it be an exception, is the treatment to be afforded the tax saving or deferral resulting from the use by the taxpayer of the declining balance method of depreciation of new equipment. In practical effect this works a tax deferral rather than a tax savings. If the company were charged for rate making purposes with such "savings" during the year in which the depreciable assets were acquired, and the rate resulting from such treatment of the taxes was thereafter used for later years, as is here the case, it is clear that the company would be paying higher taxes in subsequent years than in the test year, but would not be entitled to an adjustment in rates to cover the increase. Therefore, we approve the Commission's treatment of the "saving" resulting from using the declining balance method of depreciation for tax purposes but computing its taxes for rate making purposes on the straight line method of depreciation, placing such "savings" in a special reserve to be used to equalize tax payments in later years. These amounts can never represent added return to the company because of the restriction as to their use.
 
 
 26
 Nothing here decided prevents the Commission from giving consideration to the legislative history which resulted in these tax benefits as an aid to it in determining what figure must be used to assure the petitioner of a sufficient rate to compensate it for its depletion of gas and as an incentive to attract capital to this industry.[6]
 
 
 27
 The State of California and other intervenors contend that, though the year 1955 was accepted as a test year, evidence should be adduced to show that actual revenues for 1956 and 1957 exceeded those anticipated, and that the refunds should be in accord with the actual experience rather than with the test year. We think that in the interest of orderly administration it was within the power of the Commission to decline to open the hearings for a showing of the actual costs of services and the revenues for the years following the end of the hearings before the examiner. All parties accepted the year 1955 as the test year and we think it was not an abuse of discretion for the Commission to refuse to reopen the proceedings for such showing.
 
 
 28
 In order that the Commission may give effect to the Federal income tax savings and fix a just and reasonable rate in light of what has been said here, the petitions are granted and the cause is remanded to the Commission. Upon such remand the Commission will receive such evidence as may be necessary to enable it to fix a just and reasonable rate to permit a fair return on the well-mouth investment and provide the incentive necessary to attract capital to the exploration and development activities of the company.
 
 
 
 Notes:
 
 
 [1]
 15 U.S.C.A. § 717c provides in material part:
 "(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; * *."
 
 
 [2]
 Section 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 167 authorized the taxpayer to take depreciation on newly installed or acquired property on the "declining balance" method, which permits a much larger deduction for tax purposes the first years of the life of such property
 
 
 [3]
 The Commission's brief says:
 "This is the first rate case in which the Power Commission has had before it for decision a vigorously contested proceeding involving the effect to be given various deductions authorized by Congress in determining Federal income taxes of companies regulated by the Commission, and uncomplicated by issues respecting the amounts to be included in the company cost of service for company-produced gas."
 
 
 [4]
 The Commission said in this regard:
 "So that the Congressional incentive might not be added to the ordinary rate of return incentive, we were careful in this case to allow the tax incentive as including the ordinary rate of return, for it happened that the tax incentive was greater than the 6 percent return that we would have otherwise permitted upon this record."
 
 
 [5]
 It must be borne in mind that a six percent rate on the over-all investment yields much more than that on the equity capital. In a prior determination the Commission had found that the financial structure of El Paso was such that a six percent rate would yield approximately 14.4% on the equity capital of $100,622,000. If our mathematics is correct, the inclusion of an additional $7,704,477 of income would increase this return on the equity capital to approximately 22.1%
 
 
 [6]
 It is not clear from the record, since the point was not argued, whether the cost of service given effect by the Commission's order includes amortization of a figure representing the gas in place. Of course, if it does, then to that extent the item of compensation for gas consumed has been taken care of