295 F.2d 109
 41 P.U.R.3d 501
 CITIES OF LEXINGTON, Kentucky; GEORGETOWN, Kentucky;
WINCHESTER, KENTUCKY, et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
United Fuel Gas Company and The Dayton Power and Light
Company, Intervenors.
UNITED FUEL GAS COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
CITIES OF PITTSBURGH, PENNSYLVANIA; CINCINNATI and COLUMBUS,
OHIO; et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
United Fuel Gas Company, Intervenor.
LYNCHBURG GAS COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
United Fuel Gas Company, Intervenor.
 Nos. 8101, 8106, 8291, 8301.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 4, June 22, 1961.
Decided Oct. 2, 1961.
 
 Herzel H. E. Plaine, Washington, D.C. (Rhyne & Rhyne, Charles S.Rhyne, Lenox G. Cooper and Thomas P. Brown, III, Washington, D.C., on brief), for petitioners.
 Richard A. Rosan and Tilford A. Jones, New York City (C. E. Goodwing, Charleston, W. Va., on brief), for United Fuel Gas Co., intervenor.
 Arthur H. Fribourg, Atty., Federal Power Commission, Washington, D.C. (John C. Mason, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, and Luke R. Lamb, Asst. Gen. Counsel, Federal Power Commission, Washington, D.C., on brief), for respondent.
 
 
 1
 Herbert E. Squires, Asst. Counsel, Philadelphia, Pa., and Joseph I. Lewis, Chief Counsel, Pittsburgh, Pa., on brief amicus curiae for the Pennsylvania Public Utility Commission.
 
 
 2
 David Stahl, City Solicitor, Pittsburgh, Pa., on brief amicus curiae for the City of Pittsburgh.
 
 
 3
 James W. Farrell, Jr., Cincinnati, Ohio, on brief amicus curiae for The Ohio Municipal League.
 
 No. 8106:
 
 4
 Richard A. Rosan and Tilford A. Jones, New York City (C. E. Goodwin, Charleston, W. Va., on brief), for petitioner.
 
 
 5
 Herzel H. E. Plaine, Washington, D.C. (Charles S. Rhyne and Lenox G. Cooper, Washington, D.C., on brief), for Kentucky Cities, intervenors.
 
 
 6
 Arthur H. Fribourg, Atty., Federal Power Commission, Washington, D.C. (John C. Mason, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, and Luke R. Lamb, Asst. General Counsel, Federal Power Commission, Washington, D.C., on brief), for respondent.
 
 
 7
 James W. Farrell, Jr., Cincinnati, Ohio, on brief amicus curiae for The Ohio Municipal League.
 
 No. 8291:
 
 8
 Herzel H. E. Plaine, Washington, D.C. (John R. Cook, Jr., Corp. Counsel, Lexington, Ky., Coordinator for the Kentucky Cities; Joseph I. Lewis, Counsel, Pittsburgh, Pa., and Herbert E. Squires, Asst. Counsel, Pennsylvania Public Utility Commission, Philadelphia, Pa., Charles S. Rhyne, Edward D. Means, Jr., Washington, D.C., David Stahl, City Solicitor of city of Pittsburgh, Pa.; James W. Farrell, Jr., City Solicitor of city of Cincinnati, Ohio; and Robert J. White, Special Counsel, Cincinnati, Ohio, Russell Leach, City Atty., and William Huggins, Asst. City Atty., Columbus, Ohio, on brief), for petitioners.
 
 
 9
 Richard A. Rosan, New York City (Tilford A. Jones, New York City, Murray Zweben, No. Springfield, Va., and C. E. Goodwin, Charleston, W. Va., on brief), for United Fuel Gas Co., intervenor.
 
 
 10
 Peter H. Schiff, Atty., Federal Power Commission, Washington, D.C. (John C. Mason, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, and Luke R. Lamb, Asst. General Counsel, Federal Power Commission, Washington, D.C., on brief), for respondent.
 
 No. 8301:
 
 11
 Phebe Eppes Gordon, Lynchburg, Va., for petitioner.
 
 
 12
 Richard A. Rosan, New York City (Tilford A. Jones, New York City, Murray Zweben, No. Springfield, Va., and C. E. Goodwin, Charleston, W. Va., on brief), for United Fuel Gas Company, intervenor.
 
 
 13
 Peter H. Schiff, Atty., Federal Power Commission, Washington, D.C. (John C. Mason, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, and Luke R. Lamb, Asst. General Counsel, Federal Power Commission, Washington, D.C., on brief), for repondent.
 
 
 14
 Before SOBELOFF, Chief Judge and SOPER and HAYNSWORTH, Circuit Judges.
 
 
 15
 SOPER, Circuit Judge.
 
 
 16
 These petitions seek review of orders of the Federal Power Commission issued in a rate proceeding of the United Fuel Gas Company, a natural gas company within the meaning of 1(b) of the Natural Gas Act, 15 U.S.C.A. 717(b), which is engaged in the production, transportation and sale for resale of natural gas to public utilities in Kentucky and neighboring states.
 
 
 17
 United Fuel filed with the Commission two proposed increased rates to wholesale customers on May 12, 1954 and November 1, 1954, respectively, and thereupon the city of Lexington, Ky., and various other cities in that state intervened. Issues relating to the level of the rates were disposed of by stipulations[1] of the parties except those which relate to certain tax deductions. These deductions grow out of the use of liberalized depreciation, statutory depletion and intangible well-drilling costs. With respect to the first issue the Commission determined that United Fuel should retain the benefits of liberalized depreciation subject to certain requirements for tax deferral, but held that the benefits of percentage depletion and the intangible well-drilling costs should be taken into account in computing the cost of service. See 23 F.P.C. 127. The intervenors in this review proceeding challenge the first determination in case No. 8101, and United Fuel challenges the second determination in case No. 8106.
 
 No. 8101
 
 18
 Liberalized or accelerated depreciation is an allowance for depreciation taken for tax computation at a larger amount than would be warranted by a computation based on the straight line method of depreciation. Under straight line depreciation each unit of property is depreciated in equal yearly installments over its useful life. The employment of liberalized depreciation was authorized by 167 of the Revenue Code of 1954, 26 U.S.C.A. 167, which allows as a depreciation deduction a reasonable allowance for exhaustion, wear and tear of the property used in the business, and provides that the term 'reasonable allowance' shall include amongst other things an allowance computed by (1) the straight line method, or (2) the declining balance method. Liberalized depreciation, as provided by the declining balance method, makes larger amounts of depreciation recoverable in the early life of a property, but smaller amounts in the later years, than are recoverable under the straight line method, but in the end it does not affect or alter the total depreciation allowed. Under the declining balance method of depreciation the straight line depreciation rate is doubled and applied each year to the declining balance, in the property account. Thereby the depreciation deduction for tax purposes during the first half of the service life of each unit of property is increased and, conversely, the depreciation deduction during the last half of its service life is decreased. The aggregate of the depreciation does not exceed the original cost of the property.
 
 
 19
 Acting under this statute United Fuel elected to utilize the declining balance method and filed a petition with the Federal Power Commission to establish the manner in which the use of liberalized depreciation should be employed for accounting and rate making purposes. See Amere Gas Utilities Co. et al., 15 F.P.C. 780. In this proceeding United Fuel asked a determination whereby the Commission would recognize as a Federal income tax expense an amount computed on the straight line basis and to the extent that the income tax computed on this basis exceeded the amount of the tax payable on the accelerated basis that the excess should be charged as a tax expense and credited to a reserve for deferred taxes. After extensive hearings, in which the Kentucky cities and other interested parties participated, the Commission granted the relief requested. The Kentucky cities calculate that the determination had the effect of including in United Fuel's cost of service the amount of $322,819 for tax expense in the test year.
 
 
 20
 The conflicting arguments with respect to the propriety of the Commission's determination in this respect present an issue that has been much discussed and has resulted in conflicting decisions in the courts and in Federal and State regulatory commissions. Among the Federal agencies the treatment of liberalized depreciation by the tax deferral or 'normalization' method, as it is sometimes termed, is approved by the Federal Power Commission, the Civil Aeronautics Board, and the Securities and Exchange Commission, whereas the Interstate Commerce Commission requires the use of the so-called 'flow-through' method by which all the savings accrued as the result of liberalized depreciation are immediately passed on to the rate payers. The regulatory commissions of 22 states appear to permit the normalization of taxes, whereas the commissions of 18 states seem to follow the flow-through principle. It thus appears that the Federal Power Commission in making its determination in the instant case exercised a choice of methods which had been approved by many expert bodies in this field and disapproved by others.
 
 
 21
 The Kentucky cities and the purchasers of natural gas contend that the Commission's determination is wrong because in rate making only taxes actually paid may be included in the cost of service and because in this case, it is said, the utility will never be called upon to pay the tax which under the Commission's method has been deferred. It is pointed out that in such cases as Galveston Electric Co. v. Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678; Georgia R. & Power Co. v. Railroad Commission, 262 U.S. 625, 632, 43 S.Ct. 680, 67 L.Ed. 1144, and South Carolina Generating Co. v. Federal Power Commission, 4 Cir., 249 F.2d 755, Id., 4 Cir., 261 F.2d 915, it was recognized that Federal income taxes are a cost of doing business, but only the amount of taxes actually paid is an expense which should be considered in calculating the rate to be charged to customers. It is contended that if this principle is observed in the present case the Commission's determination must be wrong since the use of accelerated depreciation does not create increased income tax liability for future years and that, therefore, the utility will not be called upon to use the tax reserve for this purpose, and it will become in effect a contribution to capital by the consumer. Hence, it is said the tax reserve accumulated at the expense of the rate payers becomes a permanent asset of the utility. In making this argument the petitioners rely upon the alleged probability that the expanding conditions of a dynamic industry are such that the United Fuel will have a continuously increasing plant by additions in excess of retirements and a permanent reserve for taxes which it will never be called on to use for the payment of tax obligations.[2]
 
 
 22
 Furthermore, it is said that the ordinary rate making procedure of the Federal Power Commission provides for the adjustment of utility rates if changes take place so that if the rate usually determined on the basis of the operating expenses of a test year is found to be inadequate it is always feasible for a utility faced with an increased tax burden or other expense to apply to the Commission for relief.
 
 
 23
 On the other hand, it is contended by the utility and found by the Commission that the normalization method does not result in a tax saving but only a tax deferral. It is pointed out that the assumption of continual plant growth whereby plant additions exceed retirements is largely speculative and conjectural and hence the Commission was acting within its province as a trier of facts when it declined to make this assumption especially as, in this field, the life of the industry is dependent on the continual discovery of exhaustible gas reserves. Since it is not disputed that the higher deductions and the lower taxes prevail only during the earlier years of the life of depreciable units of property, and lower deductions and higher taxes prevail during the later life, it is said that the situation will not be affected by increases in the size of the plant because the portion of the reserve set up in connection with the units of property first subjected to liberal depreciation will be used to meet the increased taxes thereon in the later years. In this connection the Commission said, 23 F.P.C. :
 
 
 24
 'The basis of our determination, as set forth in that decision is that the purpose of Section 167 of the Internal Revenue Code is to assist expansion of facilities and economic growth; it is not to benefit consumers directly, but by the use of deferral accounting, the consumers are to be saved from injury. Such deferral accounting, in our opinion, is eminently sound, for with respect to any given piece of property subject to liberalized depreciation there is a deferral of taxes because of smaller amounts deducted in the later years as compared with the earlier years. We think that it would be speculative to assume that company expansion and price inflation will continue indefinitely and to assume that the net effect of liberalized depreciation will be to lower taxes each year in the foreseeable future.'
 
 
 25
 The same thought was expressed by the Supreme Court of Illinois in a water rate case in City of Alton v. Commerce Commission, 19 Ill.2d 76, 165 N.E.2d 513, 521, 523, where it was said:
 
 
 26
 'The assumption of a continuous deferral of taxes due to accelerated depreciation may be justified in many cases and the Commission would be justified in acting on this assumption if it saw fit. See, e.g., Central Main Power Co. v. Public Utilities Comm., 153 Me. 228, 136 A.2d 726; City of Pittsburgh v. Pennsylvania Public Utilities Comm., 182 Pa.Super. 551, 128 A.2d 372. Experience may show that proper results can only be achieved by this approach. However, several not unlikely events might occur which would prove the assumption erroneous. A war, a general depression or a decline in the local market might curtail a utility's capital expenditures, and prevent further tax deferrals. As a result, taxes might increase just at the time when economic circumstances would make the added expense most burdensome. It is also possible that section 167 will be repealed, thus ending further tax deferrals.
 
 
 27
 'If we could see clearly into the future and say with certainty that continuing expansion was certain, and countervailing considerations were nonexistent, we would hold that the Commission may not permit current charges for a liability that will never arise. Predictions of future developments, however, are unsure estimates at best. The problem is a new one; that factual and policy considerations that bear upon its solution have not as yet been fully developed. Even the future of accelerated depreciation in the Federal tax structure is not entirely settled. If for any reason continued investment in utility plant at current levels should cease, or accelerated depreciation be denied, the financial stability of utilities might be jeopardized if some provision had not been made for the increased taxes that would result. Rate regulation is a continuing process; greater experience may bring greater wisdom in dealing with these problems. At this time, we think it permissible for the Commission to safeguard the financial integrity of utilities by recognizing as present expenses those tax liabilities which are deferred by use of accelerated depreciation for Federal tax purposes.'
 
 
 28
 On the other hand, in other states where regulatory commissions have found it inappropriate to adopt the 'normalization' of income taxes the courts, basing their decisions upon the discretionary power given to the regulatory bodies, have affirmed the commission decisions. Thus, in Central Maine Power Co. v. Public Utilities Commission, 153 Me. 228, 136 A.2d 726, which dealt with electrical rates, the court overruled the Power Company's contentions and approved the determination of the Commission that the tax savings from the application of Section 167 of the Internal Revenue Code should be passed on to the rate payers. The court said (136 A.2d at page 738):
 
 
 29
 'The proper treatment of depreciation and taxes calls for the exercise of judgment by those trained in the field of utility regulation. There are choices to be made in the impact of both depreciation and taxes upon the present and future ratepayers. The Commission, apart from the matter of accelerated amortization, has allowed only the current income tax as a charge in rate making. It takes the position in substance that the creation of an income tax deferred reserve under the circumstances outlined would extend into the unforeseeable future charges to provide for expenses which might never arise, or to meet which, when and if the need should arise, the Company could seek relief before the Commission. There is nothing unreasonable in the conclusion reached. For example, a reduction in the tax rate might substantially lessen any anticipated impact on future ratepayers. Rates do not stand forever, and corrections may be made from time to time.'
 
 
 30
 In like manner the courts approved the decisions of the Commission denying normalization in Application of Montana-Dakota Utilities Co., N.D., 102 N.W.2d 329, and also In re Schedule Filed by Hackensack Water Co., 57 N.J.Super. 180, 154 A.2d 212.
 
 
 31
 It is obvious that we are confronted in this case with a problem in a special field which requires the exercise of expert skill that has been generally entrusted by state and Federal legislation to administrative regulatory tribunals whose decisions, in the absence of abuse of discretion, should be followed by the courts. We adopt that course in this case. Insofar as liberalized depreciation is concerned the same course has been taken in El Paso Natural Gas Co. v. Federal Power Commission, 5 Cir., 281 F.2d 567, certiorari denied sub nomine California v. F.P.C., 366 U.S. 912, 915,81 S.Ct. 1083, 6 L.Ed.2d 236, and in respect to accelerated amortization under Section 168 of the Internal Revenue Code, 26 U.S.C.A. 168, in City of Detroit v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810, 821, certiorari denied Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48.
 
 
 32
 The petition for veview is dismissed.
 
 No. 8106
 
 33
 This case involves the treatment given by the Federal Power Commission to the statutory provisions dealing with percentage depletion and intangible welldrilling costs in determining the rates to be charged by United Fuel to the consumer. In the main the Commission rejected the contentions advanced by United Fuel in these respects and, accordingly, the Company petitions for review and the Kentucky cities intervene in support of the Commission's determination.
 
 
 34
 Percentage depletion is covered by Sections 611-613 of theInternal Revenue Sections 611-613 of the Internal Revenue Code, 26 U.S.C.A. 611-613, which in the case of mines, oil and gas wells allow, in computing taxable income, a deduction for depletion of 27 1/2% of their gross income from the property. The allowance may not exceed 50% of the taxable income from the property and in no case may be less than it would be if computed without reference to Section 613 of the statute.
 
 
 35
 A deduction for income tax purposes is also allowed with respect to intangible well-drilling and development costs in the case of oil and gas wells by Section 263(c) of the Code, 26 U.S.C.A. 263(c). The producer is given the option to deduct these costs in the years in which they are incurred even though they are capitalized on the producer's books. capitalized on the producer's books. United Fuel exercised the option in this case.
 
 
 36
 Intangible well-drilling costs are the costs in general of installation of a well other than the costs of physical property installed, and such expenses include expenditures for clearing the ground, drainage, roadmaking, surveying, geological work, excavation, grading and the drilling and cleaning of wells. Although these costs may be expensed under the statute for income tax purposes, they are capitalized on the books of the company and subjected to annual depreciation in the system of accounts prescribed by the Commission for rate making purposes.
 
 
 37
 During the test year of 1955 the statutory depletion allowance of the Company amounted to $2,162,927 but the depletion expense included in the cost of service in the Commission's rate calculation was only $96,720. If the latter sum were used in computing the Company's income tax liability the tax would obviously have been far greater than it actually was by reason of the statutory allowance of the 27 1/2% deduction from the company's gross income. Income taxes are, of course, included in the expense incurred by the utility in the Commission's computation of its cost of service for regulatory purposes. United Fuel contends that its tax expense in this case should be computed as if it had been compelled to pay the larger tax based on a deduction of cost depletion rather than the tax actually paid as reduced by the statutory depletion allowance. The Commission rejected this contention and decided that the tax actually paid should be used in the computation.
 
 
 38
 The intangible well-drilling costs for the test year 1955 totaled $648,308, and in accordance with the statute this sum was charged as an expense by the Company in making its income tax return. Of this amount, however, only $11,100 was charged off on the books of the Company as a depreciation expenditure under the accounting system prescribed by the Commission. Here again the Company contends that in computing its tax expense for cost of service purposes the figure $11,100 should be used as a deduction instead of the figure $648,308[3] which it actually used in computing its income tax. Here also the Commission overruled the Company's contention and based its calculation of the Company's tax expense on the amount of tax actually paid.
 
 
 39
 The Company points out that percentage depletion is allowed by the statute as compensation for a wasting asset used up in production and that expensing of the intangible well-drilling costs is permitted in order to encourage the drilling of wells. See Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897; United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581; H.Rept. No. 761, 79th, Congress, 1st Session. It argues that it will be deprived of the benefits of these statutes if the Commission's determination is upheld. The question, therefore, is whether the Company has in fact been deprived of the tax benefits by the action of the Commission. In considering this question it must be kept in mind that the Commission in this proceeding is performing the function entrusted to it by the Natural Gas Act, 15 U.S.C.A. 717 et seq., whereby the Commission was empowered to regulate the sale and transportation of natural gas and to fix the rates and charges of natural gas companies at figures that are just and reasonable. The Congress was, of course, aware when the Natural Gas Act was passed that natural gas companies had been given special benefits under the earlier tax statutes and since no change was made in the earlier acts it was obviously intended that they continue to be operative. But it is equally clear that Congress intended the Commission to take these tax benefits into account in fixing the just and reasonable rates which the gas company should be allowed to collect from the consumers. It cannot be supposed that it was the duty of the Commission to consider these unusual concessions in the tax statutes as devices for the benefit of the producer without regard to the interest of the consuming public whose outlay furnishes the support on which the industry depends. It must be kept in mind that we are not dealing with an enterprise which itself takes all the risk, but with a regulated industry with an assured demand for its product which is protected by the requirement that in fixing the rates all elements of cost must be considered which pertain to the original investment, the depletion of capital assets, the costs of operation and the costs of exploration.
 
 
 40
 The Commission's treatment of the problem does not in our opinion deprive the utility of the benefit of the tax saving statutes. The Company still enjoys a very substantial reduction in income taxes which these statutes provide. It still makes a deduction which amounts to 27 1/2% of its gross income and it still deducts its capital installation expenditures as if they were current expenses of operation. These are substantial advantages of great value which are not enjoyed by the ordinary business enterprise or by the ordinary regulated industry. Not only is the tax obligation greatly reduced hereby but the loss of unsuccessful ventures is substantially minimized. Actually the Company keeps the tax benefits; and it has not borne the burden imposed by the Natural Gas Act to show that the rate imposed was not a just and reasonable one. See F.P.C. v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333.
 
 
 41
 We find nothing in the Natural Gas Act which requires the Commission to ignore the usual principles of cost accounting and set up a fictitious and unreal tax expense on the part of the utility in order to give it the entire benefit of the tax saving statutes and none to the consuming public. The very spirit and purpose of the regulatory provisions of the Natural Gas Act point the other way. F.P.C. v. Hope Natural Gas Co., 320 U.S. 610, 612, 64 S.Ct. 281.
 
 
 42
 In reaching this conclusion we are in accord with the decision of Judge Tuttle writing for the Fifth Circuit in El Paso Natural Gas Co. v. Federal Power Commission, 281 F.2d 567, 571, 572, 573, where he said:
 
 
 43
 'We think, however, that this does not mean that these tax benefits are to be translated into additional profits for the regulated company over and above a reasonable return on its investment. They are available to the regulated companies to make it so much the easier for them, in competition with other fuels and in competition with other industries seeking the investor's dollar to earn a fair return, including the substantial increment of incentive for exploration and development and payment for gas consumed.
 
 
 44
 '* * * We think there is nothing in the legislative history that would warrant our concluding that Congress intended the statutory depletion, deduction of intangible drilling expense, and rapid depreciation provisions of the Revenue laws to amend or modify the express language of the Natural Gas Act, * * *.
 
 
 45
 'We think, in short, that there is no statutory authority for the Commission to treat actual savings in taxes to which natural gas companies are entitled any differently than savings in any other cost of service. It is the obligation of all regulated public utilities to operate with all reasonable economies. This applies to tax savings as well as economies of management. The net result of this, of course, is that such savings as are effected are passed on to the consuming public. This we consider to be the natural and necessary consequence of rate regulation.'[4]
 
 
 46
 The determination of the Commission in these respects is, therefore approved but in one regard the basis of the decision as stated in the Commission's opinion calls for further examination. The Commission appears to have compared the amount of the savings which the Company would make under the tax statutes with the amount of the return which the Company would receive by applying the rate of return of 6 1/4% to the value of the well mouth properties; and finding that the Company's return based on this rate was greater than the return which would have resulted from giving the Company the tax benefits, the Commission concluded that there was no basis for the Company's contention that it should receive in addition the amount of the tax savings. In this connection the Commission said, 23 F.P.C. :
 
 
 47
 'If it had turned out that the tax benefits were greater than the amount produced by allowance of a 'fair' return (6 1/4% in this case) we would be obligated as before, to respect the clear and undisputed meaning of the applicable portions of the Internal Revenue Code and it would result that we would effectuate the intent of Congress by permitting the producer to retain the tax benefits.'
 
 
 48
 In reaching this conclusion the Commission, in our opinion, was in error since it focused its attention upon the tax statutes and lost sight of the broad responsibility imposed upon it by the Natural Gas Act, for it indicated that in a certain contingency it would be obliged by the tax statutes to give to the utility a greater return than the just and reasonable return to which the utility is restricted by the regulatory act. Here also we are in accord with the conclusion reached in El Paso Natural Gas Co. v. Federal Power Commission, 281 F.2d 573, where the Commission allowed the utility more than a fair return because of the statutory tax benefits. In condemning this action the Court said:
 
 
 49
 'It is the duty of the Commission to fix a rate that represents the cost of service and a reasonable return on the investment, including compensation for consumption of the gas and an increment for incentive, instead of merely treating the tax savings as the amount necessary to provide for return and incentive. This can be done only by making the necessary inquiry directed to this issue, building up a proper record, and making findings on the amount actually necessary to provide these items.'[5]
 
 
 50
 This is not an easy computation to make, and it cannot be made without taking into account all of the elements which normally enter into a rate making calculation including, in the case of gas production, the risk of exploration and the need for an incentive for future development. In appraising this element the Commission is bound to take into account the effect of tax benefits provided by the statutes and it has the power to decide whether there is need for further incentive than is afforded by these statutes, when they are applied as they have been in this case. The prime duty of the Commission in this and in all other cases is to fix a fair and reasonable rate after all of these matters have been taken into account.
 
 
 51
 We express no opinion as to the sufficiency of the 6 1/4% rate of return for that is a matter entrusted to the determination of the Commission. The rate was fixed at 6 1/4% in this case in accord with a stipulation of the parties, but the meaning and effect of the stipulation is now the subject of dispute. The Commission takes the position that since the stipulated rate of return on the well mouth properties is greater than the tax savings under the statutes the Company has no reason to complain. The Company on its part says that it agreed to the stipulated rate of return upon the condition that its position in regard to the tax savings would be sustained and since its position was rejected the stipulated return is not binding upon it. We are of the opinion, upon examination of the record, that the Company's position is correct and that the stipulation as to the rate of return is not binding upon the parties. The duty, therefore, devolves upon the Commission to determine what will constitute a just and reasonable return on the Company's investment.
 
 
 52
 United Fuel also contends that the Commission disregarded the stipulation in respect to a matter which was binding upon it. The Company says that the intangible well-drilling costs for the test year were fixed by the stipulation in the amount of $648,308, and that the Commission should have used this figure in calculating the tax costs which the Company incurred. This amount, however, was much smaller than the intangible expense in the years preceding the test year and also less than the Company's budgeted figure for the succeeding year. The Commission, therefore, deemed it reasonable to take the 5 year average of these costs for the period 1951 to 1955 which amounted to $2,135,201. It is obvious that this method was preferable to accepting the much smaller figure for the test year in arriving at the cost of service for this item. The Company argues, however, that it was improper to take the average figure because the amount of $648,308 was stipulated to be the correct figure in the test year. This contention cannot be sustained. The stipulation of the amount of the intangible expense for the test year did not prohibit the Commission from adopting a figure representative of the future in determining a just and reasonable rate for the ensuing period.
 
 
 53
 We hold that the Commission gave correct treatment in this case to the three matters of accelerated depreciation, percentage depletion and intangible well-drilling costs; and in order that the Commission may give effect to these conclusions and, in the light of this opinion, determine a just and reasonable rate of return on the Company's investment, this case is remanded to the Commission for further proceedings.
 
 No. 8291
 
 54
 The petitions in this case were filed by the city of Pettsburgh and other cities in Pennsylvania, Ohio and Kentucky to obtain a review of an order of the Federal Power Commission of September 15, 1960 which approved a settlement in respect to four rate increases filed by the United Fuel Gas Company for the period from July 14, 1957 to April 4, 1960. Most of the parties are also parties to Case No. 8101 relating to rate increases of United Fuel for the period from January 1, 1956 to July 13, 1957, decided this day in an opinion above set out. The substantive issue is the same in the two cases, i.e. whether United Fuel should retain the benefits of liberalized depreciation granted by Section 167 of the Internal Revenue Code subject to the requirement that a reserve for deferred taxes be established by the Company. The Commission gave its approval to this treatment of the matter and in Case No. 8101 its determination was affirmed. Pending the decision in that case by this court the Commission reserved final approval of the settlement in the instant proceeding.
 
 
 55
 The petitioners complain in this case that the reservation was not broad enough because it did not cover the charges of the Columbia Gas Transmission Company, an affiliate of United Fuel, which transports United Fuel's gas by pipe line from Louisiana to West Virginia on a cost plus basis that involves the use of liberalized depreciation. The reasons which actuated the Commission in its refusal to broaden the reservation as requested by the petitioners are set forth in the Commission's opinion but we need not stop to consider them at this time because of our decision in Case No. 8101. In that case we decided that the Commissions' treatment of the subject was correct and, therefore, we have no occasion to decide whether the reservation relating to United Fuel's own charges for accelerated depreciation should have been expressly extended to Columbia Gas' like charges in this particular. Since the question involved has become moot the petition for review in this case will be dismissed.
 
 No. 8301
 
 56
 Lynchburg Gas Company, the petitioner in this case, distributes and sells natural gas at Lynchburg, Va., and adjoining counties. It purchases its supply from Atlantic Seaboard Corporation which, in turn, receives its supply from its affiliate, United Fuel Gas Company. In this case Lynchburg attacks the order of the Federal Power Commission of September 15, 1960, referred to in the opinion in Case No. 8291 above set out, wherein the Commission approved a settlement between United, fuel and all of the interested parties except Lynchburg which related to four proposed increased rate filings of United Fuel. Each of the four proceedings was initiated by the filing of a new schedule of rates by United Fuel and by an order of the Commission suspending the proposed rates wherein it was stated that a hearing would subsequently by held concerning the lawfulness of the rate.
 
 
 57
 No hearing was held, however, because the agreement of settlement was reached. This was preceded by a field investigation of the Commission's staff of the books and records of the Company, and copies of these studies were sent to United Fuel, its wholesale customers, all of the intervening cities and interested parties, as well as members of the staff. All of them were notified that the studies would be introduced for discussion at a conference shortly to be held. Thereafter a series of conferences were held at which voluminous cost data compiled by the staff, as well as data supplied by United Fuel, were made available and were examined and discussed. Some of the parties also examined books and records of the United Fuel at its office. In the end all of the parties except Lynchburg agreed to the settlement. The issue relating to the normalization of accelerated depreciation was reserved in the settlement pending the decision of this court as we have seen in case No. 8291. The settlement was then considered and approved by the Commission.
 
 
 58
 The period covered by the four proceedings began July 14, 1957 and ended April 4, 1960. In general the cost studies and data supplied by the Commission's staff and by the Company showed that the revenues collected by the Company for the period from July 14, 1957 to April 6, 1959 were in excess of the cost of service. As to this period the agreement provided that United Fuel would refund to its wholesale customers the amount of $3,000,000 plus interest at the rate of 6 per centum per annum. The investigation also showed that for the period from May 14, 1959 to April 4, 1960 the cost of service exceeded the revenues of the Company and as to this period the agreement provided that the rates and charges proposed by United Fuel should be effective as of May 15, 1959 until such time as new rates may be effective consistent with the provisions of the Natural Gas Act. The order of the Commission provided that upon full compliance by United Fuel with the terms and conditions of the order the proceedings should be terminated subject only to the reservation above mentioned; but the order declared that the Commission's action should not be construed as a concurrence with the methods by which the cost of service and the amount of the refunds had been computed in reaching the settlement agreement and that neither the Commission or other parties to the proceedings should be bound thereby in future proceedings. The order also declared that it was made without prejudice to any findings which the Commission might thereafter make and without prejudice to any claims which any of the parties affected by the order should make in any proceeding then pending or thereafter instituted.
 
 
 59
 Lynchburg did not contend before the Commission and does not contend in this court that the rate of return or depreciation charges or the amount of the refund included in the settlement are improper nor does it give weight to the fact that the field investigation by the staff showed that during the period from May 14, 1959 to April 4, 1960 United Fuel was not recovering its cost of service. Lynchburg's position is that since the Commission in each of the four proceedings suspended the rate increase and announced that a hearing would be had, it could not thereafter, in the absence of unanimous consent of all of the interested parties, accept and approve an offer of settlement, but was obliged to proceed with a formal hearing and make specific findings upon the evidence produced that the proposed rate is just and reasonable as provided by Section 4(a) of the Natural Gas Act, 15 U.S.C.A. 717c(a). In support of its position Lynchburg cites the decision in Minneapolis Gas Company v. Federal Power Commission, D.C.Cir., 294 F.2d 212, wherein it was held that in a rate proceeding before the Federal Power Commission, after an Examiner has made an initial decision and exceptions thereto have been taken and a hearing, including an oral argument, has been held by the Commission, it may not terminate the proceedings without rendering a decision upon the issues presented.
 
 
 60
 Little note is taken in this line of argument of the provisions of Section 5(b) of the Administrative Procedure Act, 5 U.S.C.A. 1004(b), which provides that an administrative agency shall afford all interested parties an opportunity for the submission of facts and arguments as well as 'offers of settlement', and also an opportunity for hearing and decision of the merits of the controversy to the extent that the parties are unable to consent to its determination. The important purpose to be served by this provision for settlement of controversies before administrative agencies by agreement is emphasized in the following excerpt from the Senate Committee's report during the progress of the legislation through Congress:
 
 
 61
 'Subsection (b) provides that, even where formal hearing and decision procedures are available to parties, the agencies and the parties are authorized to undertake the informal settlement of cases in whole or in part before undertaking the more formal hearing procedure. Even courts through pretrial proceedings dispose of much of their business in that fashion. There is much more reason to do so in the administrative process, for informal procedures constitute the vast bulk of administrative adjudication and are truly the lifeblood of the Administrative process (Final Report Attorney General's Committee, p. 35). The statutory recognition of such informal methods should both strengthen the administrative arm and serve to advise private parties that they may legitimately attempt to dispose of cases at least in part through conferences, agreements, or stipulations. It should be noted that the precise nature of informal procedures is left to development by the agencies themselves. (Senate Judiciary Committee Print on S. 7, 79th Cong., 1st Sess. 8 (June 1945); Administrative Procedure Act-- Legislative History, Sen.Doc. No. 248, 79th Cong., 2d Sess. 24)'
 
 
 62
 It is quite clear that if Lynchburg's contention is sustained little scope would be left for the settlement provision of Section 5(b) of the Administrative Procedure Act. Clearly the Commission did not tie its own hands by suspending the rate increases when they were filed pending further investigation. In view of the great volume of the Commission's business and the intricacies of utility accounting practices suspension of a new schedule proposing increased rates is almost a matter of course; and it goes without saying that there is no substance to the suggestion that if the Commission at the time of suspension announces that a hearing will be held the hearing must be held no matter how futile or unnecessary it thereafter becomes by reason of a settlement. No court of law would tolerate for a moment the idea that it would be obliged to try a case that had been assigned for hearing notwithstanding the fact that the parties had reached a settlement of the controversy. Much less should such a contention be considered here with reference to the ruling of an administrative tribunal where liberality of procedure is essential in the interest of the dispatch of business.
 
 
 63
 There is nothing in the Administrative Procedure Act which expressly requires unanimous consent of all the participating parties to an agreement of settlement; and to read such a contention into the statute in view of the countless state agencies, municipalities, and consumers who may be interested in an administrative proceeding would effectually destroy the settlement provision. In this instance the kind of interest which Lynchburg entered the proceeding to represent was protected by the participation and consent of other parties in like situation. Their consent to the settlement was sufficient basis for the Commission's approval.
 
 
 64
 The statutory plan set out in the Natural Gas Act demonstrates the breadth of the Commission's discretion in rate proceedings. Under Section 4 of the statute when a Natural Gas Company filed a new schedule involving a change in its filed rate the Commission has the authority either upon its own initiative or upon the complaint of any state manicipality or state commission, without any formal pleading, to suspend the proposed rate for a period not in excess of five months and upon reasonable notice to enter upon a hearing concerning the lawfulness of the rate. But, as the courts have pointed out, it is discretionary with the Commission whether or not to suspend the rate and to hold the hearing or to permit the increased rate to become effective. See United Gas Pipe Line Co. v. Mobile Service Co., 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373. In Minneapolis Gas Co. v. Federal Power Commission, supra, upon which the petitioner relies, it is specifically pointed out that when a new schedule is filed the Commission has a broad discretion whether it will or will not permit the proposed rates to go into effect; i.e. whether it will at that point enter upon a hearing concerning the lawfulness of the proposed rate. If it decides not to enter upon such a hearing at that point consideration of the justness and reasonableness of the rate is possible at any other later time, either upon complaint or upon the Commission's own motion in a proceeding under Section 5(a) of the statute, 15 U.S.C.A. 717d(a). There is nothing in this decision which suggests that the Commission must go through with a formal hearing simply because it announces at the time a proposed rate is suspended that a hearing will be had. The court pointedly refrained from making such a ruling when it said 'we do not have before us, and therefore do not decide whether the Commission may terminate a proceeding, once entered upon, at some point prior to the conclusion of the evidentiary hearing. A change of mind, mid stream, so to speak, may or may not be permissible.' (294 F.2d 215.) Thus it is obvious that the decision of the court furnishes no basis for Lynchburg's contention in this case; and we are confident that the Court of Appeals for the District of Columbia had no intention to weaken the force and effect of the salutary provision of the Administrative Procedure Act, which permits settlement by agreement without hearing. The petition for review is dismissed.
 
 
 
 [1]
 During the course of the proceeding the parties entered into certain stipulations or agreements on September 20 and September 27, 1956. The first stipulation provided for refunds in the amount of $2,750,000 to be paid by United Fuel to 5 wholesale customers from increased revenues collected between November 1, 1954 and December 31, 1955. The second stipulation contained the agreement of United Fuel to make a refund of $250,000 for the period January 1, 1956 to August 31, 1956. Not covered by these stipulations were the issues with respect to the treatment of liberalized depreciation, percentage depletion and intangible well-drilling cost
 
 
 [2]
 We are not concerned here with the question whether or not the tax deferral fund should be included in the rate base upon which the utility is entitled to a reasonable rate of return. This matter was considered by the Commission in Northern Natural Gas, involving Section 167, in an opinion rendered Marcy 7, 1961, and also in Kansas-Nebraska Natural Gas Company, involving Section 168, in an opinion rendered March 8, 1961. The Commission allowed a rate of 1.5% on the reserve, under Section 167, for deferred taxes which it said allowed benefits both to the company and to the consumer. This rate may be contrasted with the rate of 6.25% allowed generally on the company's investment
 
 
 [3]
 As shown below theCommission in making its calculation used the average intangible tangible well-drilling cost for five years instead of the sum of $648,308 expended in the test year
 
 
 [4]
 The Company makes the additional contention that a deferral of taxes is involved when it exercises the option to expense all of its intangible well-drilling costs in the year in which they are incurred. The Company proposed to set up a reserve for deferred taxes and to treat the intangible well-drilling costs on the theory of accelerated amortization under Section 168. I.R.C. This proposal was properly rejected. The Company has exercised its option to expense the intangible costs instead of capitalizing them and amortizing them in subsequent years. It has had the benefit of the tax deduction and it has no cause to complain that in subsequent years its taxes will be greater than if the option had not been exercised, especially as the increased taxes will be included in the cost of service. It may be added that in the subsequent years deductions for intengible costs will also be available as the Company proceeds with the development of its properties
 
 
 [5]
 The opinion of the Fifth Circuit in this case was handed down after the Commission order in the pending case