The CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY COMPANY et al., Plaintiffs,

v.

UNITED STATES of America et al., Defendants.

Civ. A. No. 5393.

United States District Court
S. D. Ohio, W. D.
May 20, 1964.

James G. Headley, Cincinnati, Ohio, John F. Donelan, William D. McLean, James L. Tapley, Washington, D. C., James W. Hoeland, Elbert R. Leigh, Louisville, Ky., Thomas S. Calder, James W. Farrell, Jr., James O. Coates, Dinsmore, Shohl, Barrett, Coates & Dupree, Cincinnati, Ohio, James W. Hoeland, Elbert R. Leigh, Louisville, Ky., Philip J. Schneider, Waite, Schindel, Bayless & Schneider, Cincinnati, Ohio, John C. Lovett, Benton, Ky., Gray, Freiberg & Davis, Topeka, Kan., for State Corporation Commission of the State of Kansas, Donald Macleay, Macleay, Lunch, Channing & Bernhard, Washington, D. C., Joe Starnes, Jr., City Atty., Guntersville, Ala., W. G. Burnette, Lynchburg, Va., Nuel D. Belnap, Chicago, Ill., Leonard D. Slutz, Robert F. Reckman, Cincinnati, Ohio, James D. Knudson, Washington, D. C., for plaintiffs.

Joseph P. Kinneary, U. S. Atty., Cincinnati, Ohio, Robert W. Ginnane and Interstate Commerce Commission, I. K. Hay, Interstate Commerce Commission,

Washington, D. C., Robert H. Marquis, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

Before PHILLIPS, Circuit Judge, WEINMAN, Chief District Judge, and PECK, District Judge.

JOHN W. PECK, District Judge.

This suit is brought to set aside and annul an order issued by the Interstate Commerce Commission on July 1, 1963. The statutory basis of the action includes the provisions of Sections 1336, 1398, 2284, and 2321–2325 of the Judicial Code (28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325), Section 10 of the Administrative Procedure Act (5 U.S.C. § 1009), and Section 17(9) of the Interstate Commerce Act (49 U.S.C. § 17(9)). A temporary restraining order was granted on August 21, 1963, and has remained in effect since that time. Cincinnati, New Orleans and Texas Pacific Railway Co. v. United States, 220 F.Supp. 46 (S.D.Ohio 1963).

■ The point of departure in judicial review of an Interstate Commerce Commission determination must always be a recognition of the fact that negative resolution is not to be countenanced in the absence of compelling considerations, but that the existence of such considerations is a possibility. Abundant authority exists in support of each of these two propositions.

■■ Orders of the Interstate Commerce Commission (hereinafter usually referred to as the Commission) when issued within the scope of the Commission's statutory authority and based upon adequate findings supported by substantial evidence are not to be disturbed on review even though the Court might reach a different result on the record. Rochester Telephone Corp. v. United States, 307 U.S. 125, 138–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Virginian Railway Co. v. United States, 272 U.S. 658, 663–666, 47 S.Ct. 222, 71 L.Ed. 463 (1926);

Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941 (1926); Illinois Central Railroad Co. v. Interstate Commerce Commission, 206 U.S. 441, 454–455, 27 S.Ct. 700, 51 L.Ed. 1128 (1907). The credibility of witnesses and evaluation of the evidence are determinations to be made by the Commission alone (United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945); Alton Railroad Co. v. United States, 315 U.S. 15, 23, 62 S.Ct. 432, 86 L.Ed. 586 (1942); United States v. Illinois Central Railroad Co., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417 (1924), and it is to be presumed that the Commission has properly performed its official duties; and such presumption supports the Commission's acts in the absence of clear evidence to the contrary. (Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 512, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944); Baltimore & Ohio Railroad Co. v. United States, 298 U.S. 349, 358–359, 56 S.Ct. 797, 80 L.Ed. 1209 (1936)).

Opinions of the Supreme Court have repeatedly emphasized that the limitation of the scope of judicial review of Commission determinations is particularly applicable in rate proceedings (Mississippi Valley Barge Line Co. v. United States, supra.; Atchison, Topeka & Santa Fe Railway Co. v. United States, 232 U.S. 199, 221, 34 S.Ct. 291, 58 L.Ed. 568 (1914); Interstate Commerce Commission v. Illinois Central Railroad Co., 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280 (1910)), and for reasons which will hereinafter become obvious the caution of the following quotation must remain in mind:

"We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance and competition differently than the Commission has done in this case. That is a task peculiarly for it. In fashioning what the Commission called a differentially related and finely bal-

anced rate structure for this coal, there is no place for dogma or rigid formulae. The problem calls for an expert, informed judgment on a multitude of facts. The result is that the administrative rate-maker is left with broad discretion as long as no statutory requirement is overlooked." Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593, 69 S.Ct. 278, 289, 93 L.Ed. 243 (1949).

In spite of the foregoing, as is indicated by the very existence of the machinery for judicial review of Interstate Commerce Commission determinations, it is not the function of a court sitting in such review merely to apply a rubber stamp of approval regardless of whether or not criteria for affirmance are established by the record. On the contrary, to merit judicial approbation the Commission must have made certain basic, essential findings (Atchison, Topeka and Santa Fe Railway Co. v. United States, 218 F.Supp. 359, 363–364 (N.D. Ill.1963)), and such findings cannot be upheld unless they are clear and precise (Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 294 U.S. 499, 510–511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488–489, 62 S.Ct. 722, 86 L.Ed. 971 (1942). See also, Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 634, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); Secretary of Agriculture of United States v. United States, 347 U.S. 645, 653–654, 74 S.Ct. 826, 98 L.Ed. 1015 (1954)). It thus here becomes our responsibility, giving full recognition to the expertise of the Commission and according to its order all of the presumptions to which it is by law entitled, to make a determination as to whether the Commission's findings are supported by substantial evidence, are clear and precise, and are not arbitrary, capricious, or an abuse of discretion.

When this matter was earlier before this Court on plaintiffs' motions for a temporary restraining order (Cincinnati, New Orleans and Texas Pacific Railway Co. v. United States, 220 F.Supp. 46, 47 (S.D.Ohio 1963)), we made this observation concerning the mass of material presented:

"The record before the Interstate Commerce Commission * * * consists of 15,815 pages of testimony and 766 exhibits. Approximately 150 witnesses were called in 139 days of proceedings, and the Commission in its brief says that the record is 'perhaps the most voluminous' ever made before it."

In view of the negative nature of some of the essential findings which hereinafter appear, mention is made of the fact that before determining that substantial evidence on any point required to be proved did not exist, a diligent and painstaking search of the massive record was made and every lead suggested in the voluminous briefs of counsel was carefully pursued. Support in the record therefore exists for the negative as well as the affirmative findings of fact which appear below and upon which the conclusions of law which follow are based.

## FINDINGS OF FACT

1. This cause arises upon a complaint filed by the Cincinnati, New Orleans & Texas Pacific Railway Company and other corporate members of the Southern Railway System seeking to set aside the Report and Order entered by the Interstate Commerce Commission in *Grain in Multiple Car Shipments—River Crossings to the South*, I & S Docket No. 7656, decided on July 1, 1963, by the entire Commission of eleven members, with the three members of Division No. 2 dissenting.

2. The Southern Governors Conference, the Southeastern Association of Railroad and Utilities Commissioners, the City of Cincinnati, and the Secretary of Agriculture of the United States intervened as plaintiffs and adopted the position of Southern. The Department

of Justice filed an answer in which it admitted certain of the allegations of Southern. The Louisville and Nashville Railroad Company and other principal railroads serving the southeastern states of the United States filed an intervening complaint seeking review of the Commission's Report and Order in part.

Numerous protestants in the proceedings before the Commission intervened in this action as defendants including Archer-Daniels-Midland Company; Cargill, Incorporated; Central Soya Company, Inc.; The Merchants Company; Morris Grain Corporation; State Corporation Commission of Kansas; Tennessee Valley Authority; City of Guntersville, Alabama; O. J. Walls, doing business as O. J. Walls Company; John D. Bagwell Farms & Hatchery, Inc.; Southeastern Association of Local Grain Producers, Processors, Merchandisers and Consumers; Tennessee River and Tributaries Association; Waterways Freight Bureau; and The American Waterways Operators, Inc.

3. The proceedings before the Commission arose from the proposal of Southern to reduce rates on shipments of grain by an average of sixty (60%) percent to specified points in the Southeast. The reduced rates would apply only to multiple car shipments of not less than 450 tons of grain from one consignor to one consignee on one bill of lading. The rates were for bare transportation service only and would not cover transit privileges, absorption of connecting line switching charges, and the usual free time for loading and unloading.

The rates as proposed were constructed on a formula of forty-two (42¢) cents per ton for terminal services and .573 cents per ton mile for line haul services. In addition a minimum rate of $2.40 (240 cents) per ton was established. This had the effect of fixing the application of the minimum rate on all shipments traveling less than 346 miles. These rates are available to shippers from Tennessee River ports on the same basis as to shippers from Ohio and Mississippi River gateways.

4. Southern contemplated the use of five of the newly developed jumbo aluminum covered hopper cars known as "Big Johns" for each 450 ton shipment of grain. Southern owns five hundred of these cars each of which is capable of handling more than one hundred tons of grain, offer a much higher ratio of payload to deadweight than the conventional boxcar equipment, and thus these cars make it possible to transport grain at far less cost. The Commission characterized the development of these cars as "a major breakthrough in the control of cost and a notable advance in the art of railroading." (Comm. Op. p. 7)

Promptly after Southern's publication of these rates and in order to remain competitive with Southern, other railroads serving the Southeast (intervening plaintiffs herein), published comparable reduced multiple-car rates on grain shipment carried in conventional equipment, requiring nine cars (instead of five "Big Johns") to carry the minimum load.

5. These reduced rates were designed to capture for the railroads an increased share of the expanding grain traffic moving from the Middle West into the Southeast, a grain deficit area. In 1960 the movement of at least four million and probably as much as six million tons (estimated sixty (60%) percent of the entire traffic) into the Southeast was accounted for by long haul itinerant truckers. These truckers transport grain into the Southeast as a regulation-exempt backhaul movement after delivering other commodities in the Middle West. These backhaul truckers have complete flexibility in making their transportation charges and may, depending on market conditions, charge as little as expense or gasoline money. From 1955 to 1960 the participation of these backhaul truckers in the long distance movement of grain to the Southeast increased steadily and tremendously while the rail carriers' share of the total volume declined.

The other methods of transporting grain into the Southeast are by rail from the producing areas, by barge to the Tennessee River ports and thence by truck or rail to the consuming markets in the Southeast which are generally located less than 346 miles from the port cities.

6. The reduced rates proposed by Southern and the other railroads serving the Southeast were scheduled to become effective on August 10, 1961. Upon protest by certain interested parties and under the authority of the Interstate Commerce Act, (hereinafter referred to as the Act), the effective date of the proposed rates was suspended by the Commission, subsequently the suspension was voluntarily extended by Southern, and the Commission undertook an investigation into the lawfulness of the proposed rate reduction.

7. On January 21, 1963, Division 2 of the Commission, which here had initial responsibility, issued a Report and Order finding the proposed rates lawful. On April 12, 1963, upon petitions for reconsideration, the full Commission reopened the proceeding. On July 1, 1963, the Commission issued its Report and Order. The Commission adopted the findings and conclusions of Division 2 with some modification but made the opposite determination. The Commission found that the proposed 240 cent minimum had an effect which would be unduly prejudicial to the Tennessee River ports and unduly preferential to the Ohio and Mississippi River ports in violation of Section 3(1) of the Act (49 U.S.C. § 3(1)).[1] The Commission also found that the level of the proposed rates would be inadequately compensatory, unjust and unreasonable, and thus violative of Section 1(5) of the Act (49 U.S.C. § 1(5)).[2] The Commission concluded that this violation could be cured by a sixteen (16%) percent increase in the proposed rates, which would be fifty-three (53%) percent lower than the pre-existing rate level.[3]

8. This action was subsequently brought asking that the Commission's order be set aside, annulled and enjoined as not supported by adequate subsidiary findings, as not supported by the substantial evidence of record, as in excess of the Commission's statutory authority, as arbitrary and capricious and as con-

1. Section 3(1) of the Act provides:
"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however*, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

2. Section 1(5) of the Act provides:
"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

3. While the hearings before the Commission were still in progress, the seven-month suspension period allowed by 49 U.S.C. § 15(7) expired on March 9, 1962. The effective date of the new reduced rates was voluntarily extended by Southern and the other railroads until August 7, 1962. Before this latter date arrived, certain barge lines and shipper interests, including certain of the intervening defendants, obtained temporary restraint against the effectiveness of the new rates. On April 15, 1963, the Supreme Court of the United States, upholding the courts below, held that the courts lacked jurisdiction, prior to the final order of the Commission to suspend the effectiveness of rates after expiration of the seven-month suspension period prescribed by Section 15(7). Arrow Transportation Co. v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

stituting an abuse of discretion. Southern also alleged that the Commission's order violated Section 15a(3) of the Act (49 U.S.C. § 15a(3)).[4]

9. On August 21, 1963, this Court granted a temporary restraining order under 28 U.S.C. § 2284(3) suspending the effectiveness of the Commission's order pending a final determination of this suit. Cincinnati, New Orleans & Texas Pacific Railway Co. v. United States, 220 F.Supp. 46 (S.D.Ohio 1963). Southern's rates have been in continuous effect since May 11, 1963.

10. In support of its conclusion that the rates are unduly prejudicial to the Tennessee River ports and preferential to the Ohio and Mississippi River ports in violation of Section 3(1) of the Act, the Commission found:

(a) That the proposed rates are constructed on a formula which contains a 240 cent minimum operative for distances up to 346 miles. Thus the minimum would not apply to shipments of grain from the Mississippi and Ohio River crossings to the major markets in the Southeast served by the Tennessee River ports since those markets are more than 346 miles from the Mississippi and Ohio River crossings. On the other hand the minimum would be the applicable rate for shipments from the Tennessee River ports to most of the important markets served by these ports.

(b) That the resultant higher per mile charge from the Tennessee River ports would injure warehousemen and merchandisers of grain, many of whom have substantial investments located at those ports, since these persons would be unable to compete with others located at the Ohio and Mississippi River ports who can offer a lower per mile rate for the transportation of grain to the same destination.

(c) That no substantial difference existed in competitive transportation conditions at the preferred and prejudiced ports. The Commission's subsidiary findings on the similarity of competitive conditions is as follows:

(1) No defense is available to the Southern here by reason of any substantial dissimilarity in transportation conditions as between the origins preferred and those prejudiced.

(2) Merchants and shippers of grain located at the Tennessee River ports, along with the ports themselves, compete with shippers and other port interests located at the Mississippi and Ohio River crossings.

(3) Severe truck competition exists at the Tennessee River ports as well as at the Ohio and Mississippi River crossings.

11. The purpose of the multiple car rates was to make the railroads competitive with the dominant long-distance backhaul truck movement of grain from the Middle West to the Southeast. There is no showing that similar long haul truck movements exist in relation to the

---

4. Section 15a(3) of the Act provides: "In a proceeding involving competition between carriers of different modes of transportation subject to this chapter and chapters 8, 12, 13 and 19 of this title, the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstances attending the movement of the traffic by the carrier or carriers to which the rate is applicable. *Rates of a carrier shall not be held up to a particular level to protect the traffic of any other mode of transportation,* giving due consideration to the objectives of the national transportation policy declared in this chapter and chapters 8, 12, 13 and 19 of this title." (Emphasis added.)

Tennessee River ports. The record establishes that truck movements in relation to those ports are shorter, less than 346 miles, and made without backhaul payloads. Expenses and any profit must therefore be realized from this one-way, one-pay haul and those engaged in it cannot afford to transport commodities for gasoline money as can long-distance backhaul truckers.

12. The determination by the Commission that the level of the proposed rates is violative of Section 1(5) of the Act rests in large measure on its prior conclusion that Section 3(1) has been violated by the 240 cent minimum. The Commission determined that when Southern cures that unlawful discrimination, Southern's annual car utilization would decline, its costs would increase, and the proposed rates (without the unlawful discrimination) would not be adequately compensatory. The Commission sought further support for this conclusion by finding:

(a) That there was no reliable evidence of record to support the claimed utilization figure of 40,000 which had been used by Division 2. The Commission therefore computed the return on the basis of an annual utilization figure of 20,852, the same utilization figure as conventional hopper car equipment.

(b) That approval of the reduced rates of the other railroads serving the Southeast would tend to reduce Southern's car utilization.

(c) That Southern's costing procedures duplicated the exclusion of "non-applicable" items of maintenance.

The Court finds:

(1) In reference to (a) above, that Southern entered an exhibit which indicated that their actual experience with the use of "Big John" cars under multiple car rates had been a utilization figure of 60,212 and that these jumbo cars moving on regular rates without restriction as to loading and unloading in single car shipments had a utilization rate of 39,079. The advantages of these new cars (see finding 4) coupled with the elimination of delays (see finding 3) render unsound the Commission's use of a utilization rate identical with that achieved on conventional equipment.

(2) In reference to (b) above, the record indicates that Southern computed its proposed rates on the assumption that it would secure approximately sixteen (16%) percent of the grain shipment involved (Exhibits 68 and 503) and further that Southern has maintained from the outset that the other railroads should also be allowed reduced rates.

(3) In reference to (c) above, the Commission made no findings to support the conclusion as required by 5 U.S.C. 1007.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties in this action pursuant to 28 U.S.C. §§ 1336, 2284 and 2321–2325, and 5 U.S.C. § 1009.

2. The venue of this action is properly laid in this court. 28 U.S.C. § 1398.

3. A conclusion by the Interstate Commerce Commission that Section 3(1) of the Interstate Commerce Act, 49 U.S.C. § 3(1), has been violated must be supported by several findings, including that of the discriminatory treatment under substantially similar transportation and competitive conditions.

The Commission's purported finding on this essential element is inadequate to support the conclusion of a violation under Section 3(1) and is not

itself supported by substantial evidence in the record. The conclusion constitutes an abuse of discretion in that it was made despite other findings by the Commission that transportation conditions, as between the points of origin allegedly unduly preferred and those allegedly unduly prejudiced, are in fact not similar. The conclusion that Section 3(1) of the Act has been violated being invalid must be set aside.

4. The conclusion by the Interstate Commerce Commission that the rates are unlawful as violative of Section 1(5) of the Interstate Commerce Act, 49 U.S.C. § 1(5), is invalid and must be set aside because it is based on the invalid premise that Section 3(1) of the Act has been violated and on findings as to car utilization and costing procedures which are not supported by substantial evidence in the record.

5. The conclusion of the Interstate Commerce Commission that the proposed rates must be increased in order to avoid unfair and destructive competition in violation of the National Transportation Policy, 49 U.S.C. preceding Section 1, is invalid and must be set aside because the conclusion violates Section 15a(3) of the Interstate Commerce Act, 49 U.S.C. § 15a(3); it exceeds the statutory authority granted to the Commission; and it is not supported by substantial evidence in the record.

6. The Order of the Interstate Commerce Commission in *Grain in Multiple Car Shipments—River Crossings to the South,* I & S Docket No. 7656, is accordingly null and void, and must be enjoined and set aside.

## CONCLUSION

This opinion shall stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure, and in accordance herewith the Order of the Interstate Commerce Commission entered July 1, 1963, will be permanently suspended, annulled and enjoined.